(No. 42897, 43107 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. DWIGHT SPRINGS *et al.,* Appellants.

*Opinion filed March 30, 1972.—Rehearing denied May 25, 1972.*

HOWARD T. SAVAGE, of Chicago (HOWARD O. EDMONDS, of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and JACK HOOGASIAN, State's Attorney, of Waukegan (JAMES B. ZAGEL, Assistant Attorney General, and THOMAS M. P. HANNIGAN, JAMES J. DE SANTO and JOHN V. VIRGILIO, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE WARD delivered the opinion of the court:

An indictment was filed in the circuit court of Lake County charging Dwight Springs, Johnson Hill and Ted Braden with the rape of Katherine Kwas and with attempt to rape Angela Vocino. The count charging the attempt was dismissed prior to trial. A jury returned verdicts of guilty as to Hill and not guilty as to Braden. Springs, who had obtained a severance, was found guilty in a separate trial. Sentences of not less than four nor more than six years were imposed.

Because the charges against Springs and Hill have a common background, and as the defendants' contentions here are similar, the appeals have been consolidated. The contentions are: (1) their right to trial by jury was violated because the jury was not properly instructed; (2) they were not proved guilty beyond a reasonable doubt.

The defendants and Braden met Katherine Kwas and Angela Vocino, who were 19-year-old college students, in Waukegan at about 8:30 P.M. on March 14, 1969. The girls, who were driving to a dance at the naval station at Great Lakes, stopped in Waukegan so that Kwas could purchase hose to replace the damaged hose she was wearing. Upon returning to the car, Kwas was unable to start it and she asked the defendants and Braden, who were driving by, to assist them. After the car had been started the girls went with the three men to the apartment of one of the men. There, between 9:30 P.M. and midnight, the defendants had intercourse with Kwas. At about 12:30 A.M. Kwas left the apartment without Angela, who was in another room of the apartment. She unsuccessfully attempted to start her car, then walked to a tavern, and phoned the police, reporting that she had been raped.

Kwas testified in the trial of Springs and in the trial of Hill and Braden. She testified that after the defendants and

Braden had assisted her in starting her car, they had asked Angela and her to do them a favor. They said they were members of a band, and in some way not made clear by the record, it would assist them in acquiring musical instruments if they would pose as go-go girls when introduced to the men's booking agent. The girls agreed, she said, to return the men's favor in starting the car. She testified they drove to an apartment building in Waukegan where the girls expected to meet the booking agent. After they entered the apartment the men and they discussed bands and go-go girls, and Kwas testified that she gave Springs her telephone number so that they could call her if the band ever played in the Milwaukee area where the girls lived. Hill dialed a telephone number and told her to ask for a man named John or Johnson. She did this, she said, but as Hill had curiously predicted to her Johnson could not be reached at the number called. Then Angela and she were led, according to her testimony, into the living room to dance even though she said she did not want to dance and though she and Angela expressed their desire to leave the apartment.

When they attempted to leave, she testified, someone turned out the lights in the apartment, except for a lamp in the living room. She tried to use the telephone to call for help but someone took it from her. She began to scream, and someone pushed her onto the living room couch. She struggled with Hill and he kissed her. Then Springs slapped her and told her that if she did not "shut-up" she would not "get out of this whole." She testified that Springs then pulled her to the floor by her ankles, took off her undergarments and fondled her while Hill straddled her shoulders and forced her to submit to a deviate sexual act. When Hill left the living room Springs forced her to perform a deviate sexual act, and forced her to have intercourse with him. Kwas said that all of this time she was struggling and trying to get away. When Springs left the room she began to dress, but Hill returned.

He pushed her to the floor, slapped her, pulled her hair and struck her head against the floor. Then he forced her to have intercourse with him. Hill then helped her find her shoes, she said, and told her he would help her to start the car. She testified she called to Angela and was told that Angela would meet her at the car. Hill apparently went outside with Kwas but then returned to the apartment building. She said that when she could not start her car, she walked to a tavern and phoned the police.

She testified that her glasses had been broken, her skirt had been ripped and her mouth was bloody. Later, she said, bruises appeared on one of her ankles, on one thigh and near one breast.

Angela Vocino's testimony as to the events preceding the turning out of the lights in the apartment was substantially the same as that of Kwas. After that, she said, Hill and Braden took hold of her as she attempted to leave the apartment. They dragged her into the bedroom, tore off her hose and tried to remove her other clothing. She testified that at this time she heard Kwas screaming and objects being thrown about in the other room. Braden forced her to kiss him, she said. Then Hill slapped her, and she was not allowed to leave the room until the police arrived.

Dr. Stephen Sipos, the physician who examined Kwas early in the morning of March 15, testified at both trials. He said that his examination showed that Kwas had engaged in sexual intercourse within several hours prior to the examination and that there were no signs of trauma to the internal pelvic organs, or other parts of her body. On cross-examination, he testified that often bruises will not become apparent until several hours after the trauma which caused them.

Kwas' mother, Mrs. Alethea Kwas, testified at both trials. She said that she had seen her daughter's broken glasses, ripped skirt and broken purse chain. She also testified that when she had visited her daughter at the

hospital she had seen bruise marks on her right ankle.

Curtis Brown, a Waukegan police officer, also testified at both trials. He said that when he saw Kwas shortly before midnight of March 14, she was crying, her glasses were broken and there was blood on her mouth. She told him she had been raped.

Nels Sorenson, another member of the Waukegan Police Department, was a witness at both trials. His testimony was that when he saw Kwas at the police station about one o'clock in the morning of March 15, she had appeared to be emotionally upset and had encrusted blood around her mouth. He said that some of her clothes were torn and her glasses were broken.

Springs took the stand, but his testimony was limited to answering "no" when asked by the attorney who represented him at trial whether he had raped Kwas. He said on cross-examination that he had been with Kwas in the apartment, but at that point his attorney objected to questioning, apparently on the ground that it would exceed the scope of the direct examination. The trial court sustained the objection.

Braden testified that he and the two defendants had met the girls when they had solicited help in starting their car. He said that they had asked the girls to join the band as go-go dancers, not to pose as go-go dancers. The girls agreed to join the band and accompanied them to the apartment. Braden said there had been no conversation about an agent. The girls danced with the men, he said, and began a conversation about sex. He asked Angela to go into the bedroom with him. She and he petted but she refused to have intercourse with him. She had agreed to have relations with him at the second meeting, he said. He did not force her or hold her against her will. He testified that Kwas gave Hill her telephone number voluntarily, just before Hill and Kwas left to try to start the car. He said that about 15 minutes later when the police arrived, he allowed Angela to admit them. He testified that Angela

had not asked to leave before the police arrived. He did not hear any scream nor sounds of struggling in the living room. He had turned out the light in the apartment for reasons of economy, he testified.

Hill testified at his trial only. He told of meeting the girls and asking them to join the band as go-go dancers and inviting them to the apartment. In the apartment, he said, they went into the living room and danced. Hill said he danced with both girls, and Braden danced with Kwas. Kwas, he said, told him she was a virgin but would try anything once. He said that Braden and Angela went into the bedroom and Springs and Kwas went into the living room, while he was making a phone call in the kitchen, he testified that he could see Kwas and Springs kissing. He said that he had gone into the living room but had returned to the kitchen leaving Springs and Kwas alone. He testified he had never entered the bedroom. He said that Springs left the apartment about 12:30 A.M. After Springs had gone Kwas told him that she had had relations with Springs but that she didn't want to leave. According to his testimony she had sat down next to him and then on his lap. When Hill asked her to have relations with him, she said that she was a virgin but would try anything one time. (This, of course, was inconsistent with her admission of having had relations with Spring.) After that they had relations, but he did not force her to do so. Later she went into the kitchen, he said, because she had lost part of her glasses. He testified that she gave him her telephone number so that he could phone her the next evening. He testified that he and Kwas then went out to try to start her car, but they could not start it. Hill testified he went to get Braden to assist them; but he said that when Braden and he returned to the automobile, Kwas had left. She returned to the apartment in about 20 minutes with the police. He testified that he did not see Kwas crying that evening, and he did not observe that any of her clothes had been torn.

The defendants make several claims to support their position that the jury was not properly instructed.

The first claim is that Illinois Pattern Jury Instruction Nos. 9.02 and 9.03, which were given, are erroneous. No. 9.02 states: "When I use the word 'by force and against her will' I mean that under the circumstances the female did not voluntarily consent to sexual intercourse." No. 9.03, so far as its pertinent part is concerned, reads: "To sustain the charge of rape, the State must prove the following proposition: *** Third: That the act of sexual intercourse with Katherine was by force and against her will, and that she did not voluntarily consent." Both instructions have the language "did not voluntarily consent." The claim is that the tautology is confusing to a jury. It is said, too, that in some way the defendants do not make clear in their argument that a jury following this language might conclude that seduction constituted rape.

The record shows that neither defendant at his trial objected to the giving of these instructions. Our Rule 451 (Ill.Rev.Stat. 1969, ch. 110A, par. 451) says in part: "Counsel may object at the conference on instructions to any instruction prepared at the court's direction, regardless of who prepared it, and the court shall rule on these objections as well as objections to other instructions. The grounds of the objections shall be particularily specified. *** [S]ubstantial defects are not waived by failure to make timely objections thereto if the interests of justice require." A failure to object to proposed instructions operates as a waiver of the objection (Supreme Court Rule 451; *People v. Mallett (1970), 45 Ill.2d 388*). We do not find in the instructions any substantial defect which in the interests of justice would prevent the operation of the rule of waiver under Rule 451. In fact, it can be said that the use of the word "voluntary" in conjunction with the use of the word "consent" could serve to emphasize that the consent must be voluntary.

Another claim of instructional error is that a certain instruction, which the defendants set forth in their briefs, should have been given. The instruction concerned the necessity of force and the exercise of resistance, if feasible. We cannot entertain this claim because there was no request by the defendants that the instruction now suggested be given. Our Rule 451(c) declares: "Instructions in criminal cases shall be tendered, settled, and given in accordance with section 67 of the Civil Practice Act ***." (Ill.Rev.Stat. 1969, ch. 110A, par. 451(c).) Section 67(3) (Ill.Rev.Stat. 1969, ch. 110, par. 67) in part says: "No party may raise on appeal the failure to give an instruction unless he shall have tendered it." This standard was illustrated in *People v. Damen (1963), 28 Ill.2d 464,* where we remarked: "[W] e have repeatedly announced the rule that the court is under no duty to give instructions not requested by counsel." 28 Ill.2d 464, 469.

In the next contention of error Springs refers to one instruction which he tendered and the trial court refused to give, and Hill points to two declined instructions. Each says that had the trial court instructed as requested, it would have corrected the errors in Illinois Criminal Pattern Jury Instructions Nos. 9.02 and 9.03 which the trial court did give. The argument does not persuade. It is supposititious in that it assumes error in the two Pattern instructions. We have observed already that the language "did not voluntarily consent" may be tautological but we do not consider it was legally erroneous. There was no necessity of "correcting the error" in Pattern Instructions Nos. 9.02 and 9.03.

The next principal argument of the defendants is that they were not proved guilty beyond a reasonable doubt.

This court has said that reviewing courts are charged with a special duty of carefully examining the evidence in rape cases. *(People v. Qualls (1961), 21 Ill.2d 252.)* But in such an examination the courts may not encroach upon

the function of the jury to weigh credibility and otherwise assess the evidence presented in the course of the trial. In this regard a verdict should not be disturbed unless a review of the record gives rise on review to a reasonable doubt of a defendant's guilt. That the evidence presented at trial has been conflicting will not justify a reversal of a finding by the trier of fact. *People v. Hiller (1955), 7 Ill.2d 465.*

The conduct of the young women here was obviously and highly imprudent, but, of course, this rashness cannot be equated with consent to sexual relations. The dominant question here was whether Kwas and Vocino consented to the acts of Hill and Springs. The answer was dependent on the credibility to be given Kwas, Vocino, and the other witnesses and the assessment to be made of the other evidence. Here, not one but two juries decided the question in favor of the prosecution. The record is not one which calls for the overturning by this court of the verdicts of the two juries. The testimony of the prosecutrix Kwas denying consent to intercourse with the two men was unequivocal and not unlikely. Too, there was corroboration of it. In *People v. Hiller (1955), 7 Ill.2d 465,* we affirmed a conviction for assault with intent to commit rape and noted that the testimony of the prosecutrix was corroborated by a girl companion, though the companion did not witness the assault concerned and was aware only of events which preceded the assault. Here Angela Vocino, who though not raped was assaulted, testified that she heard Kwas screaming and things being knocked about in the other room. The screaming and noise are consistent with the charge that the intercourse was obtained by force and not consent. The prosecutrix testified that her glasses had been broken, her skirt ripped, her mouth bloodied and she had bruises on an ankle and thigh and near her breast. Her mother testified she had seen her daughter's broken glasses, ripped skirt and a broken purse chain. She testified, too, that her daughter's right ankle had been

bruised. Officer Brown testified that when he saw Kwas shortly before midnight on March 14 she was crying and she told him she had been raped. Her glasses had been broken and there was blood on her mouth. Officer Sorenson had seen Kwas at the police station about one o'clock in the morning on March 15. His testimony was that she was emotionally upset, had encrusted blood around her mouth, her clothes were torn and her glasses were broken. In *Hiller,* when affirming the judgment of conviction, we noted that the prosecutrix's "bruised physical condition stands as mute evidence to support her testimony." (7 Ill.2d 465, 470.) Here the condition of the prosecutrix was corroborative of her testimony. Her condition was consistent with her testimony that she had been taken by force; it was inconsistent with the defendant's testimony that she had readily consented. The offense charged as to Vocino was, of course, attempted rape. As we have observed, the question of the credibility of her testimony was for the assessment of the two juries.

In *People v. Sumner (1969), 43 Ill.2d 228, 232,* we observed: "It is pecularily the province of the jury to weigh the evidence, judge the credibility of witnesses and determine the facts. A reviewing court will not set aside a jury's verdict of guilty unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to cause a reasonable doubt as to the guilt of the accused. *People v. Prohaska, 8 Ill.2d 579, 589-90; People v. Sustak, 15 Ill.2d 115, 123; People v. Ford, 19 Ill.2d 466, 480."*

For the reasons given the judgments of the circuit court of Lake County are affirmed.

*Judgments affirmed.*