THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
TERRY D. SWEENEY, Defendant-Appellant.

Third District   No. 75-240

Opinion filed March 31, 1977.

Richard W. Hopp, of Hurt, Fuller & Hopp, of Decatur, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (Michael B. Weinstein and James E. Hinterlong, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

On October 29, 1974, the defendants, Terry D. Sweeney, Vandal Dorn and Ivan Hines, were indicted along with Jerry Baker and Wayne Young, for the offense of rape (two counts), deviate sexual assault (two counts) and intimidation (two counts). At the time of trial, one count each of rape, deviate sexual assault and intimidation was dismissed due to the absence of one of the two victims. At the same time, and for the same reason all charges against Baker and Young were dismissed. The three remaining defendants were represented by the same retained counsel, Robert H. Kunz.

Following a jury trial in the Circuit Court of Peoria County, Sweeney and Hines were found guilty of rape, deviate sexual assault and intimidation and Dorn was found guilty of rape and deviate sexual assault. Dorn was sentenced to concurrent terms of not less than 7 years nor more than 21 years imprisonment for the two offenses of which he was convicted. Sweeney was sentenced concurrently to terms of imprisonment of not less than 9 years nor more than 27 years for rape and deviate sexual assault and not less than 3 years nor more than 9 years for intimidation. Hines received concurrent sentences of not less than 12 years nor more than 36 years for rape and deviate sexual assault and an additional concurrent sentence of not less than 3 years nor more than 9 years for intimidation.

The three defendants appeal from this adverse determination. However, the appeal of Sweeney is separate from the appeal of Dorn and Hines. This opinion will deal with the issues raised by the defendant Sweeney and those issues raised by Dorn and Hines which coincide with the issues raised by Sweeney. A separate opinion, *People v. Dorn* (3d Dist. 1977), 46 Ill. App. 3d 820, 361 N.E.2d 353, will deal with the other issues raised by the appeal of Dorn and Hines.

The victims of the defendants' acts, and the complainants, were Martha Anderson, also called Martha Anderson Peterson due to her marriage before the trial, and Debbie Waddell. Ms. Waddell did not testify at the trial.

Martha Anderson testified that she and Waddell went to a laundromat on October 20, 1974. On the way, they drove past a house, and Waddell thought that she saw someone whom she recognized as Steve Cole. Subsequently, the two girls walked to this house, which was around the

corner from the laundromat, so Waddell could obtain some "speed" (amphetamines) from Cole. The house, located at 1315 Northeast Jefferson in Peoria, apparently was the clubhouse of the Arapahoe Motorcycle Club of which the defendants were members.

When the girls arrived at the house, three men dressed in motorcycle attire were on the front porch. The men indicated that Cole was in the house, and the girls entered. Inside, Anderson said that two men put their arms around Waddell, and one of the men, defendant Hines, poked a pistol into Waddell's side. Then, two or three men forced Waddell into a bedroom where they played with her breasts and tried to take her clothes off. Meanwhile, Anderson was offered a beer, and she sat on the couch in the adjoining livingroom. No one was touching Anderson at the time; but one of the men asked if she wanted to take Waddell's place, and she said no. Anderson said that she didn't think she was "very free to leave." While she waited on the couch, one of three men watching her put his arms around her and grabbed her breasts. Another man, identified as defendant Sweeney, had a long gun which he carried to the front of the house, asked if there were any "pigs" outside, and then moved to the back of the house where Anderson heard the gun discharge. Anderson said that People's Exhibits 1 and 2, long barrelled guns, seized at the house by the police and admitted into evidence over objection, were of the same type she saw in the possession of Sweeney. The police subsequently executed a search warrant and seized these rifles (People's Exhibits 1 and 2) together with some ammunition (People's Exhibit 2A). Prior to the trial, the defense moved to suppress the evidence seized in this search, but the motion was denied. At the trial, all of these exhibits were introduced into evidence over an objection by the defense.

Anderson was on the couch for an hour and could not see what was happening to Waddell, but she heard her friend yelling at the men to quit and also for help. At one time, Sweeney pointed a broomstick between Anderson's legs and said "how would you like that."

Later, one of the men asked Anderson to go into the bedroom with him. She refused, but was told she had "no choice" as she was their "captive". Hines and Sweeney were present during this conversation, and Hines said that "he would get rough if he had to." Anderson said she was scared and went into the bedroom with an unidentified man, not one of the defendants. She engaged in oral sex and intercourse with this man, against her will. When the man finished, Anderson was left alone in the bedroom for about a minute where she saw a door but did not try to escape because she did not realize the door led outside.

Anderson admitted that she never offered any physical resistance to anything which happened to her while she was in the house, and never made any physical attempt to leave, but claimed this was because she was

afraid and felt she could not safely make it out of the house. None of her clothing was ripped, and she had no bruises or marks on her when examined at the hospital.

Afterward, Anderson said she had sexual relations with five more men, Dorn being the second man and Hines the third. She did not include Sweeney in this group. According to her testimony, when Dorn entered she had put on her jeans and shoes, but was topless. Dorn said, "Hi, young lady" and laid down. He then said, "Give me some face." He had no weapon, but he pulled her hair and forced her to put his penis in her mouth. The entire episode with Dorn, which Anderson did not resist, lasted about ten minutes, involving oral sex and intercourse. After Dorn finished, Hines told Anderson that he had a knife and that he too wanted "some face" (oral sex). After oral sex and during intercourse, Hines told her that she was "lousy at screwing" and that she "had better do better or he was going to cut her throat." Anderson said she was not screaming, scratching, or struggling when she was with Hines.

Following intercourse with the sixth man, Anderson was again left alone in the bedroom; however, she did not think of leaving through the door because she wasn't dressed yet. Subsequently, two men came to the doorway, and she asked if she could leave but was told by one of the men, not one of the defendants, that she couldn't leave until they were done with Waddell, and was instructed to go to the kitchen, and smoked a cigarette. All three defendants were in the livingroom when a man in the kitchen asked her to return to the bedroom. Hines then came in and told her that she "better get in there." She went with the man and performed oral sex, but the man could not get an erection because he was "speeding too much." Sweeney then interrupted the couple saying, "Hurry up, we want some entertainment," whereupon the man attempting to have intercourse led Anderson into the bedroom in which Waddell was being confined. Both women, who were naked, protested and Waddell was crying. The man who had led her then pushed Anderson onto the bed. Twelve people were in the room, including the defendants and two other females. Eventually, Waddell was told by Hines to "eat" Anderson. The girls asked that they not be made to do this, but Sweeney poured whiskey on Anderson's vagina, and announced "They are sterile now." The girls were required to perform oral sex upon each other while Hines clicked a camera. Anderson also said Hines threatened to "barbeque her baby."

Finally, according to Anderson, after Sweeney threw their clothes at them the girls dressed and went to the bathroom to wash up. While they were in the bathroom, the girls requested their purses. Over a defense objection, Anderson then testified that she looked in her purse and asked for her money back, to which either Hines or Sweeney responded "someone must have stolen it" and they laughed.

Hines asked for Anderson's address, which she gave him, and he wrote it down. Hines then warned Anderson "if she told anybody or the police, he was going to cut her throat, her husband's throat, and her baby's throat." Sweeney was present when Hines gave this warning. The girls departed, in Anderson's words, upset and worn out, going first back to the laundromat and then to Anderson's residence where their boyfriends awaited.

Anderson explained that the girls did not go directly to the police because they "didn't know what to do right at that moment." In addition, they elected not to tell their boyfriends the truth because they were afraid of being beaten. Instead of explaining that they went to and entered the house voluntarily they told their boyfriends the Arapahoes had stopped them on the street and made them go to the house.

The girls, their boyfriends, and their children spent the night with a friend in Brimfield, Illinois, and remained undecided about what to do. Daniel Peterson, Anderson's boyfriend (and later husband) testified that during the evening in Brimfield, he heard the girls upstairs laughing. The next morning they returned to Peoria, stopping at Waddell's mother's and then at Daniel Peterson's sister's. The sister, Sharon Doering, suggested calling the police, and it was she who eventually did call the police. Anderson said she told Doering the same lie about entering the house which she had told the boyfriends. It was to the police that she first related the story offered at trial.

During cross-examination, the defense counsel questioned Anderson regarding her interviews with the police; and in response to an unrelated question, Anderson indicated that she had taken a lie detector test. The court interrupted her remark but did not admonish the jury concerning the impropriety of lie detector evidence.

Another line of questioning in cross-examination involved the reputation for chastity of Anderson's companion, Debbie Waddell. Waddell had been arrested in Florida on a morals charge about two months prior to this alleged incident. The court ruled that, whereas evidence of the specific act in Florida was precluded, evidence of Waddell's general reputation in the community for being a prostitute would be allowed. When the defense counsel proceeded to question Anderson about Waddell's reputation, he elicited information that Waddell herself had told Anderson that she had a bad reputation; and when asked what was meant by a bad reputation, Anderson said, "She had been pretty wild." The court, however, sustained a State objection to an inquiry as to the more specific meaning of this phrase.

The defense presented the testimony of the defendants and a former codefendant, Wayne Young. Hines said that when the girls entered the house, a party was in progress, and denied that he was carrying a pistol.

Hines did not talk to the girls personally, but did hear Waddell say she had no money and was willing to trade for "speed." Two men "played" with Waddell, and she laughed, asking, "Is this how you become an Arapahoe mama?" Eventually, a man named "Bob", from Chicago, went into the bedroom with Waddell, no force or threats were used. When Bob returned from the bedroom, he sat beside Anderson on the couch and talked to her. Anderson did not try to push him away or scream; and in about five minutes, Anderson followed Bob into the bedroom. Hines went into the bedroom after Bob, who had said Anderson was "ready to pay for her speed." He had oral sex and intercourse with her. Hines denied making threats or using force. He did not recall the whiskey pouring incident or the bathroom warning.

Dorn testified that he was absent from the house for a period of time after the girls' arrival; and when he returned, Anderson was already in the bedroom with Bob. Dorn said he went in the bedroom following Hines. He also had oral sex and intercourse with Anderson; but no force was applied, and she neither protested or struggled. Dorn believed this was another party similar in nature to previous affairs.

The defense witnesses testified that there was no force used at any time and that the girls were free to go at any time. They also testified that Sweeney did not point a broomstick at Martha and that Martha and Debbie did not have mutual oral sex together at any time. They also denied that any weapon was discharged. They further denied taking anything from the women's purses and denied making any threats on the lives of the women or their families. Sweeney denied having sex with either woman. All of the defendants denied making any deal for speed, and it was claimed that that deal was apparently made by "Bob", whose name and address are unknown. The witness Young stated that sexual activity of this nature was common in this house, because there are many girls who have loose sexual arrangements or activity with various members of the club.

At the conclusion of the evidence, the State tendered its instructions. None were tendered by the defense. However, the court asked that an instruction based upon IPI Criminal No. 3.11 be given, labeling it a defense instruction. A limiting instruction on proof of other crimes (IPI Criminal No. 3.14) was not tendered by either side nor given by the court.

The defendants argue that they were not proven guilty beyond a reasonable doubt. The basis of this argument is that the complainant's testimony was neither clear and convincing nor adequately corroborated because the testimony of the other witnesses concerning the explanations of the incident related by the victim to those witnesses was hearsay not within the spontaneous utterance exception.

■■ ■ For a rape conviction to stand, the prosecution must have

shown that the intercourse was by force and against the will of the victim. (Ill. Rev. Stat. 1975, ch. 38, par. 11—1.) The testimony of a single credible witness is sufficient to support a conviction (*People v. Gary* (1st Dist. 1976), 42 Ill. App. 3d 357, 356 N.E.2d 135), even though the accused contradicts the witness' testimony. (*People v. Jones* (1st Dist. 1976), 42 Ill. App. 3d 353, 356 N.E.2d 114.) The conviction in a rape case will be sustained based on the uncorroborated testimony of the victim if her testimony is clear and convincing. (*People v. White* (1962), 26 Ill. 2d 199, 186 N.E.2d 351.) Otherwise her testimony must be corroborated. (*People v. Faulisi* (1962), 25 Ill. 2d 457, 185 N.E.3d 211.) The amount of force required to prove nonconsensual intercourse is not fixed by any standard. Each case must be considered on its own merits. Nevertheless, it is not incumbent upon the prosecution to show the victim resisted where the evidence established the existence of circumstances under which resistance would be futile, the life of the victim is endangered or she is overcome by superior strength or paralyzed by fear. (*People v. Smith* (1965), 32 Ill. 2d 88, 203 N.E.2d 879.) In addition the nature of the force or the threat of force which must be proven for deviate sexual assault is the same as that for rape. (*People v. Giacinti* (3d Dist. 1976), 44 Ill. App. 3d 699, 358 N.E.2d 934.) The briefs of the defendants do not argue the insufficiency of the proof for the convictions of intimidation.

The testimony of Anderson was clear and convincing. Her story never wavered during direct or cross-examination, and her identifications of the defendants were unequivocal. Since it is the province of the jury to weigh the evidence, judge the credibility of the witnesses and determine the facts, a reviewing court will not set aside a guilty verdict unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to cause reasonable doubt as to guilt of accused. (*People v. Barksdale* (1st Dist. 1976), 44 Ill. App. 3d 770, 358 N.E.2d 1150.) In this case we find no basis for setting aside the verdict.

The clear and convincing nature of the testimony was not disturbed even though the victim admitted she did not resist because she was in a clearly disadvantageous position and outnumbered so that resistance would be useless. Furthermore, the testimony of the prosecutrix was corroborated by other evidence presented at the trial, including the complaint of rape to her boyfriend and the weapons and ammunition found in the house by the police.

■■ Generally, unless the statement by the victim is a spontaneous utterance, the person to whom the statement was made can only testify that the victim complained of being raped. (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25.) If it is a spontaneous declaration, however, the victim's entire statement may be admitted into evidence. (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25; *People v. Rogers* (5th Dist.

1975), 25 Ill. App. 3d 7, 322 N.E.2d 563.) To be a spontaneous utterance, the statement must refer "to an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, there was an absence of time in which to fabricate, and the statement related to the circumstances of the occurrence." *People v. Rogers* (5th Dist. 1975), 25 Ill. App. 3d 7, 10, 322 N.E.2d 563, 566.

■■ Since the victim in this case had time to fabricate, and did in fact fabricate, a story about the incident, her statements to the police and her boyfriend can not be considered spontaneous utterances. Nevertheless, the defense did not object to the testimony of the boyfriend, now husband, and the police, concerning the statements made to them by the victim. Ordinarily, the failure to object would constitute a waiver, but the defendants argue it was plain error for the trial court to allow this testimony to go to the jury and, therefore, this court should consider the issue in spite of the lack of an objection in the trial court. Ill. Rev. Stat. 1975, ch. 110A, par. 615(a).

■■ We disagree, this is not plain error, the defense counsel, as a tactical decision, wanted the victim's inconsistent statements as to what occurred before the jury. So the objections were consciously waived, and hearsay testimony which is not objected to "is to be considered and given its natural probative effect as if it were in law admissible." *People v. Koester* (1st Dist. 1975), 31 Ill. App. 3d 28, 32, 332 N.E.2d 755, 758.

The defendants did object to the admission into evidence of a Springfield semiautomatic .22-caliber rifle, a Marlin lever-action .22-caliber rifle and 13 rounds of Marlin .22-caliber ammunition. The issue now raised is whether the trial court properly refused to suppress these items. The basis of the defendant's contention here is that the victim's affidavit which established probable cause for the search warrant specifically referred to a shotgun, not a rifle.

■■ The search warrant was issued to recover the contraband and instrumentalities of an armed robbery. Under the law of Illinois it was lawful for the police officers to seize any articles which were in plain view and which, due to the surrounding circumstances, they reasonably believed constituted evidence of criminal activity. (*People v. Sprovieri* (1969), 43 Ill. 2d 223, 252 N.E.2d 531; *People v. McCracken* (1964), 30 Ill. 2d 425, 197 N.E.2d 35; *People v. Caruso* (1st Dist. 1971), 2 Ill. App. 3d 80, 276 N.E.2d 112.) The standard by which reasonableness is determined is "whether the facts available to the officer at the moment of seizure or search were such as to warrant a man of reasonable caution to believe the action taken was appropriate." *People v. Caruso* (1st Dist. 1971), 2 Ill. App. 3d 80, 81, 276 N.E.2d 112, 113. Accord, *People v. Miezio* (2d Dist. 1968), 103 Ill. App. 2d 398, 242 N.E.2d 795.

■■ Although neither of these weapons is a shotgun, the police could

reasonably believe these rifles constituted evidence of criminal activity. Given the situation and degree of emotional upset of the victim in this case, a reasonable person would be warranted in believing that the victim was confused and mistook a rifle for a shotgun. Therefore, the trial court properly denied the defendant's motion to suppress and properly overruled the later objection to the admission of this evidence.

The next issue raised by the defendants is whether the trial court erred by failing to admonish the jury to disregard the complaining witness mentioning a lie detector test. The complaining witness made mention of the lie detector test in response to a question posed by the defense counsel on cross-examination. Although the answer was not responsive to the question, the examining attorney did not ask the court to strike the answer. The trial court interrupted the witness' remark and precluded any further testimony on this subject. However, no admonition was given to the jury, and none was requested by either party.

■■■ This is not a case in which testimony was elicited concerning a defendant taking or refusing to take a lie detector test. Nor was there any testimony indicating the results of the polygraph examination. The rule of law in Illinois is that the results of a lie detector test can not be introduced into evidence for the purpose of proving the guilt or the innocence of the accused. (*People v. Nicholls* (1970), 44 Ill. 2d 533, 256 N.E.2d 818; *People v. Zazzetta* (1963), 27 Ill. 2d 302, 189 N.E.2d 260.) The rationale behind this rule is the yet unproved reliability and accuracy of this means of ascertaining the truth. (*People v. Zazzetta* (1963), 27 Ill. 2d 302, 306, 189 N.E.2d 260, 263.) However, statements by a State's witness which refer only to the fact that the test was taken, and not the results thereof, have been held to be not excludible under the rationale of *Zazzetta*. (*People v. Martin* (1st Dist. 1965), 62 Ill. App. 2d 203, 210 N.E.2d 798, *aff'd* (1966), 35 Ill. 2d 289, 220 N.E.2d 170.) Even though this court has held that it is improper for the prosecution to ask any witness whether that witness was offered an opportunity to submit to a polygraph examination (*People v. Rutledge* (3d Dist. 1977), 45 Ill. App. 3d 779, 359 N.E.2d 1233), the situation before us now is different. In this case, the remark was a nonresponsive answer to a defense question during cross-examination. The statement could only be stricken on a request from the questioning counsel, the only one who has standing to object to the nonresponsive nature of the witness' remark. (*Hester v. Goldsbury* (1st Dist. 1965), 64 Ill. App. 2d 66, 212 N.E.2d 316.) Obviously, by failing to object, the questioning counsel may retain the remark in evidence even though it is not responsive to the question. In the case at bar, the defense made no objection to the remark, did not ask to strike it and did not request that the trial court admonish the jury. Therefore, this objection was waived, and the defendants can not raise this issue on review.

The next issue raised is whether the incompetency of the defendant's counsel substantially prejudiced the right of the defendant to a fair trial and without which the result of this case would probably have been different. The Illinois Supreme Court has stated:

"Where a defendant in a criminal case employs counsel of his own choice, his judgment of conviction will not be reversed merely because his counsel failed to exercise the greatest skill or for the reason that it might appear, in looking back over the trial, that he had made some tactical blunder. (*People v. Ney*, 349 Ill. 172; *People v. Barnes*, 270 Ill. 574; *People v. Anderson*, 239 Ill. 168.) This court has said that ordinarily a defendant who retains counsel of his own selection is responsible if that counsel does not faithfully serve his interests; that any other rule would put a premium upon pretended incompetence of counsel, for if the rule were otherwise a lawyer with a desperate case would have only to neglect it in order to insure reversal or vacation of the conviction. (*People v. Heirens*, 4 Ill. 2d 131, 143; *Mitchell v. People*, 411 Ill. 407, 408.) In *People v. Reeves*, 412 Ill. 555, 562, 563, this court quoted with approval the language of Mr. Justice Minton in *United States v. Ragen*, 166 Fed. 2d 976, in which he pointed out that the best of counsel makes mistakes and that his mistakes, although indicative of lack of skill or even incompetency will not vitiate the trial unless on the whole the representation is of such low caliber as to amount to no representation and to reduce the trial to a farce." (*People v. Stephens* (1955), 6 Ill. 2d 257, 259-260, 128 N.E.2d 731, 732.)

A reviewing court has the authority to examine the trial record to determine the competency of even selected counsel (*People v. Allen* (3d Dist. 1971), 132 Ill. App. 2d 1015, 270 N.E.2d 54), but the defense counsel will not be considered to have acted so incompetently as to warrant a new trial unless, after examining the record, the reviewing court determines that the representation received by the defendant was so grossly inadequate as to reduce the proceedings to a farce or the caliber of representation afforded deprived the defendant of any opportunity of being found not guilty. *People v. Allen* (3d Dist. 1971), 132 Ill. App. 2d 1015, 270 N.E.2d 54.

■■ The defendant is not entitled to a perfect trial. We have reviewed the record, and although the tactics of the defense counsel proved to be unsuccessful, we do not find that the representation of the defendants either reduced the proceedings to a farce or deprived the defendants of any opportunity to be acquitted, in spite of the appellate counsel's suggestions of what might have been done.

■■ In a related issue, the defendant Sweeney contends that his position was antagonistic with that of his codefendants and, therefore, he

was "entitled" to separate counsel. Certainly Sweeney was entitled to separate counsel if he so desired. However, his engaged counsel of choice was that of the other defendants. Furthermore, we do not believe the position of Sweeney was so antagonistic with that of the other defendants as to require separate counsel.

Sweeney denies engaging in any sexual activities. This is not in conflict with the testimony of the victim or the codefendants. The codefendants position was that the victim voluntarily engaged in sexual activity, and all of the defendants deny using any form of intimidation to force the victim to participate in sexual activity with Sweeney's codefendants. These positions are not mutually exclusive or inconsistent.

Although codefendants have a right to separate counsel if their positions are antagonistic, such antagonism is not necessarily found where the same attorney represents more than one defendant. (*People v. Durley* (1972), 53 Ill. 2d 156, 290 N.E.2d 244.) There is nothing in the record to suggest that a different result could follow if Sweeney was represented by an attorney other than the attorney representing his codefendants. Therefore, we find no error in the trial court failing to *sua sponte* appoint separate counsel for defendant Sweeney.

The last issue raised by the defendants concerns whether the sentences are excessive. In raising this issue, the defendants request that the reviewing court reduce their sentences.

The offenses of rape and deviate sexual assault are Class 1 felonies, while the offense of intimidation is a Class 3 felony. (Ill. Rev. Stat. 1973, ch. 38, pars. 11—1(c), 11—3(b) and 12—6(b).) The maximum term of imprisonment for a Class 1 felony is any term in excess of four years. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(b)(2).) The minimum term for a felony of the same classification is four years "unless the court, having regard to the nature and circumstances of the offense and the history and character of the defendant, sets a higher minimum term." (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(c)(2).) For a Class 3 felony, on the other hand, the maximum term is any term in excess of one year but not exceeding ten years, and the minimum term is one year "unless the court, having regard to the nature and circumstances of the offense and the history and character of the defendant sets a higher minimum term * * *." Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(b)(4), (c)(4).

■■ A reviewing court must be cautious in exercising its power to reduce sentences, for the trial judge is in a superior position to make a sound determination of the punishment to be imposed, relating the rehabilitation potential of the defendant to the nature of the offense committed. (See *People v. Taylor* (1965), 33 Ill. 2d 417, 211 N.E.2d 673; *People v. Valentine* (1st Dist. 1965), 60 Ill. App. 2d 339, 208 N.E.2d 595.) A reduction in sentence is not to be granted out of judicial clemency

(*People v. Aristole* (1st Dist. 1971), 131 Ill. App. 2d 175, 268 N.E.2d 227), but only where the record indicates an abuse of discretion by the trial court. (*People v. Cole* (3d Dist. 1974), 23 Ill. App. 3d 620, 321 N.E.2d 71.) After considering the nature and circumstances of the offense as shown by the record, we believe the trial court exercised its discretion properly.

Accordingly, the judgment of the Circuit Court of Peoria County against Terry D. Sweeney is affirmed.

Affirmed.

ALLOY, P. J. and STENGEL, J., concur.