THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
OTIS MERRITT, JR., Defendant-Appellant.

Fourth District   No. 14835

Opinion filed October 6, 1978.

Richard J. Wilson and Don L. Johnson, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Robert C. Perry, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE REARDON delivered the opinion of the court:

Defendant, Otis Merritt, Jr., was charged by information with the offenses of rape and intimidation. Following a trial by jury, the defendant was found guilty of both charges and sentenced to concurrent terms of 5 to 10 years for rape and 1 to 3 years for intimidation.

The defendant's principal claim on appeal is that the evidence was insufficient to establish his guilt of the crime charged. The complaining witness, Valerie Ingram, a freshman student at the University of Illinois in Champaign-Urbana, testified that she had first met the defendant during the week of August 22, 1977. Ingram and the defendant saw each other subsequent to this first meeting, but always in the presence of other students or persons. Approximately a week and a half after they first met, Ingram told the defendant that he was beginning to annoy her and her roommate, and she asked that he not visit them anymore.

Three days later, on September 5, 1977, the defendant called Ingram and insisted on seeing her that evening. When the defendant arrived at Ingram's dormitory, she first declined to leave with him, but acquiesced after the defendant insisted and took hold of her arm and ushered her into a waiting cab.

Ingram and the defendant were driven to two different bars in Champaign-Urbana by the same cab driver at the direction of the defendant. After leaving the first bar, Ingram asked the defendant to take her back to her dormitory, but he refused, and directed the cab driver to proceed to a second stop, a nightclub called the "Smiling Eyes." When they arrived, the defendant left the cab and told the driver not to go anywhere. Ingram remained in the cab and after a few minutes she asked the driver to take her home, but he gave no response and failed to comply with her request. Ingram's account of her request to the driver was not contradicted.

After the defendant returned to the cab, he told the driver to go to a place called Graveyard Hill. On the way there, Ingram allegedly told the defendant that she wanted to go home, and, upon her doing so, the defendant became angry and stated that if she did not do what she was told he would hurt her and her family. When they arrived at Graveyard Hill, the driver left the cab. Ingram testified that the cab had stopped on a secluded side road bordered by trees and shrubs. She further stated, that being a new resident of Champaign-Urbana she did not really know where she was. After the driver had left the cab, the defendant, according to Ingram, told her he wanted her to work as a prostitute for him. When she refused, the defendant slapped her face several times and again threatened that if she did not do what he asked he would "mess up" her face and hurt her family. The defendant then pushed Ingram out of the cab where he repeated his threats and again struck her. Ingram testified

that she did not try to run away because she did not know where she was and she did not seek assistance from the cab driver because it seemed to her that the driver knew the defendant.

After they had returned to the cab and while riding back to Ingram's dormitory, the defendant tried to remove Ingram's pants. Again, she did not ask the driver for help because of the defendant's prior threats and her belief that the driver would not assist her. The State also introduced the testimony of the cab driver, William Brainard, that during the drive from Graveyard Hill to the dormitory he overheard the defendant ask Ingram, "You're going to call the police, aren't you?"

When they arrived at the dormitory, the defendant followed Ingram to her room and as they walked through the lounge of the dormitory, Ingram and the defendant passed by other students. Ingram stated that she did not ask any of these people for help, because just prior to entering the building, the defendant threatened he would kill her if she tried anything.

When they entered Ingram's room, the defendant had a short conversation with Ingram's roommate, Peggy Taylor, and Taylor thereafter left the room. The defendant, after pushing Ingram, told her to get on her bed, which she did, and he began to pull her pants off. As he was pulling her pants, he told her that "from now on you're going to do what I say," and that she was a "whore." Ingram also testified that he again repeated that if she tried anything or went to anyone he would kill her and her family. Ingram who was 5 feet tall and weighed 103 pounds, stated that she attempted to resist the defendant's efforts by demanding in a loud voice that he leave her alone and by twisting her legs and locking her ankles.

The defendant succeeded in eventually removing Ingram's pants and underwear and in undoing her blouse. During this struggle, however, none of her clothes were torn. After the defendant had undressed, he climbed on top of her, but because she had again twisted her legs and folded her body, the defendant was unable to have intercourse with her. The defendant then told Ingram to get on top of him, and she complied with the demand and changed her position. The defendant then made penetration. Ingram testified that she had acquiesced in his demand to get on top of him because he had threatened that if she didn't cooperate with him he would kill her. After the act was completed and while she dressed, the defendant told her that "now [she] was really a whore," and again threatened her and her family if she tried to go to the police.

After she had dressed, Ingram left the room and went across the hall to a dormitory bathroom. On the way, she saw her roommate who followed her into the bathroom, while the defendant remained in the hallway outside the bathroom door. While in the bathroom, Ingram grabbed Taylor and told her, "Don't leave me alone with him." On direct

examination, Taylor testified that Ingram appeared scared, frightened, and had tears in her eyes. On cross-examination, Ingram admitted that the bathroom she had entered had two entrances and that it would have been possible to exit through the other entrance into a different hallway. She stated, however, that she didn't leave by this other entrance because the defendant was standing by the bathroom door watching every move she made. After leaving the bathroom, Taylor entered their dormitory room and the defendant closed the door behind her while he and Ingram remained in the hallway. He then told Ingram to walk him to a waiting cab. On cross-examination, however, Ingram could neither remember whether the defendant had asked her to walk with him or whether he had kissed her goodnight before he left.

After returning to her room, she began to cry and told her roommate, "You don't know what I've gone through to keep my life tonight." Taylor, in her direct testimony, stated that Ingram informed her in so many words that "he" had raped her. Ingram did not call the police at that time because the defendant, prior to leaving, had told her that if she tried to tell anyone or call the police, he would know because he had contacts in the police department. She thereafter decided she would leave town, but was unable to reach any of her family or friends in Chicago. Shortly thereafter, at approximately 1:30 or 2 a.m. on September 6, Ingram and Taylor decided to go to the home of Taylor's sister who lived in Champaign. During direct examination, both stated that they became lost and that they did not arrive at the house until 5 or 6 a.m. that morning.

Later, on the morning of September 6, Ingram, Taylor, and Taylor's sister returned to Ingram's dormitory. Don Kamalsky, a resident coordinator for the university, was contacted concerning the incident in Ingram's room, and following a discussion with the three women, the police were called.

Later that same day, the defendant returned to Ingram's dormitory. Kamalsky testified that he called the police. While the defendant was talking to another resident director, the police arrived and the defendant began to run, but was subsequently apprehended by the police.

Jill Cunningham, a resident in the room next to Ingram's, testified that she did not hear any unusual noises or a scuffle on the night of September 5. However, on cross-examination, she admitted that she went to bed at 12 a.m. and did not awaken until the next morning. The testimony of other witnesses confirmed that the defendant and Ingram did not return to the dormitory until approximately 12:30 a.m. the morning of September 6. Mary Grazino testified that she saw Ingram and the defendant together that evening, that they had exchanged greetings, and that Ingram did not appear to be upset.

The defendant testified in his own behalf that, on September 5, he

called Ingram and asked if she wanted to go to the "Pittypat" bar with him. The defendant thereafter picked her up and they went by cab to the "Pittypat" and then to the "Smiling Eyes." After they departed from the second club, the defendant told the cab driver to take them to a spot in the north end of Urbana, so they could talk.

The defendant admitted that he and Ingram argued, but he stated that the argument was over her going to Chicago. He further testified that during the argument, he patted Ingram on the face, but denied that he threatened either her or her family.

On the way back to the dormitory, Ingram and he began kissing each other in the cab. After they arrived at the dormitory and went up to Ingram's room, Taylor, Ingram's roommate, left them alone to talk. The defendant testified that thereafter he and Ingram began kissing while lying on her bed. Ingram then took off her clothes and laid back down on the bed. The defendant removed his own clothes, and they then had intercourse. The defendant testified that he never threatened Ingram or her family. He further stated that Ingram never protested or offered any resistance to his advances. Finally, the defendant testified that when Ingram walked him downstairs to a cab, they held hands and he put his arms around her. Before he left, they kissed goodnight.

■█ Reviewing courts, in rape cases, are "especially charged with the duty of carefully examining the evidence," and should "reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt * * *." (*People v. Taylor* (1971), 48 Ill. 2d 91, 98, 268 N.E.2d 865, 868.) Ultimately, the court must be satisfied that the act was committed by force and against the will of the prosecutrix. Although it is generally stated that the evidence must show such resistance as will demonstrate a lack of consent, resistance need not always be established. The facts of each case must be considered in determining the issue of consent and, thus, it has been held that resistance is not necessary where it would be futile or where the victim was "paralyzed by fear or overcome by superior strength of her attacker." (48 Ill. 2d 91, 98, 268 N.E.2d 865, 869.) *People v. Sweeney* (3d Dist. 1977), 46 Ill. App. 3d 858, 361 N.E.2d 344.

■█ The evidence, as set forth in great detail above, shows that the victim's clothes were not torn, there were no marks or bruises on her body, and the victim had in part cooperated with the defendant. However, rape can be established by the threat of force which coerces a female to engage in sexual intercourse, as well as by the actual use of force. (*People v. Smalley* (1st Dist. 1976), 43 Ill. App. 3d 600, 602, 357 N.E.2d 93.) The victim's testimony disclosed that the defendant repeatedly threatened both her and her family. These threats, accompanied by his actual use of force in striking her in the face, form a

sufficient foundation of evidence from which the jury could surmise that any lack of resistance was the consequence of her paralyzing fear.

The defendant, however, argued that any inference that the act was against the victim's will is negated by her failure to seek help or attempt to escape when the opportunity arose. However, demonstration of a cry for help is not necessary where the victim is restrained by a fear of violence. (*People v. Armstrong* (1st Dist. 1976), 43 Ill. App. 3d 586, 595, 357 N.E.2d 84.) Ingram testified that she didn't seek assistance from the cab driver because he appeared to know the defendant and he had earlier refused her request to take her back to the dormitory. She also stated that when she first began to fear the defendant, after he had become abusive and slapped her, the cab was parked in an isolated spot and she did not really know where they were. Finally, the victim testified that the defendant's threats that he would kill her or hurt her family if she "tried anything" prevented her from crying out for help at various times during the ordeal.

■ In addressing the defendant's contentions, we note the Illinois Supreme Court's recent reiteration of the principle that, even as to rape cases, it remains "primarily the function of the trier of fact to pass upon the credibility of witnesses and the weight of the evidence." (*People v. Secret* (1978), 72 Ill. 2d 371, 376, 381 N.E.2d 285, 288.) The jury was able to observe the demeanor of the witness. Additionally, the jury was in the position to critically judge the credibility of the victim's explanation of why in the end she complied with the defendant's demands or why she failed to avail herself of an opportunity to escape or to seek help. Inasmuch as there was sufficient evidence for the jury to conclude that the victim's failure to resist or to cry out was instilled by a fear of vilence, we cannot encroach upon their function to weigh the evidence. (*People v. Springs* (1972), 51 Ill. 2d 418, 425-26, 283 N.E.2d 225.) In view of the victim's clear and unwavering testimony and the corroborative testimony of her roommate, we conclude there was sufficient evidence to find the defendant guilty beyond a reasonable doubt. See *People v. Sweeney* (3d Dist. 1977), 46 Ill. App. 3d 858, 865, 361 N.E.2d 344.

● 4 The defendant next contends that his conviction should be reversed on the grounds that a portion of the corroborative testimony of the victim's roommate was improperly allowed into evidence. Specifically, the defendant asserts that the statement made by Ingram to her roommate shortly after the defendant left, that "you don't know what I've gone through to keep my life tonight," was inadmissible hearsay. We first note, however, that the defense failed to object to this remark at trial or raise the alleged error in his post-trial motion. We conclude, therefore, as in *Sweeney* (46 Ill. App. 3d 858, 866, 361 N.E.2d 344), that alleged hearsay testimony which is not objected to may be considered by the trier of fact

and given its natural probative effect. See also *People v. Rogers* (4th Dist. 1975), 32 Ill. App. 3d 788, 789, 336 N.E.2d 784.

Finally, the defendant asserts as reversible error the admission of certain irrelevant testimony by the victim that allegedly resulted in unfair prejudice to the defendant. During Ingram's direct testimony, she stated that she overheard the defendant tell her roommate that he was a "pimp." The defense objected to this statement, but the objection was overruled.

The State contends that the statement was relevant to the question of defendant's motive in committing the offense of rape and the question of the lack of the consent of the victim. The prosecution may introduce competent evidence regarding the presence of a motive which would lead the accused to commit the act charged. *People v. Jorczak* (1937), 366 Ill. 507, 513, 9 N.E.2d 227; *People v. Richards* (2d Dist. 1970), 120 Ill. App. 2d 313, 336, 256 N.E.2d 475.

The State contends that, as to the issue of motive, the statement is relevant insofar as the rape of Ingram may have been prompted by the defendant's desire to force her to work for him as a prostitute. The State asserts that once the victim was forced to submit to intercourse in response to his threats and intimidation, the defendant believed she would be more likely to work as a prostitute. The inference that one who would act as an agent of prostitution would resort to rape, a blatant act of aggression and intimidation, to coerce a woman to work for him as a prostitute is not unreasonable.

It is apparent, in light of the other testimony of the victim, that the statement regarding the defendant's proclaimed occupation is relevant to the question of his motive or intent. For example, the victim stated that the defendant had asked her to work as a prostitute for him, and when she refused he became angry and struck her. Further, she testified that as the defendant was trying to forcibly remove her pants, he told her that from then on she was to do what he said, and that she "was a whore." Finally, after he completed the act, he allegedly told her that "now [she] was really a whore." The test of relevance is whether the fact introduced in evidence has a tendency to make the proposition at issue more or less probable. (*People v. Peter* (1973), 55 Ill. 2d 443, 459, 303 N.E.2d 398, *cert. denied* (1974), 417 U.S. 920, 41 L. Ed. 2d 225, 94 S. Ct. 2627; *People v. Galloway* (1963), 28 Ill. 2d 355, 360, 192 N.E.2d 370, *cert. denied* (1964), 376 U.S. 910, 11 L. Ed. 2d 608, 84 S. Ct. 665.) We cannot conclude that the statement attributed to the defendant was irrelevant to the issue of his motive or intent to commit the crime.

Judgment affirmed.

MILLS and CRAVEN, JJ., concur.