2018 IL App (1st) 142134

No. 1-14-2134

Opinion filed February 16, 2018

Fifth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 3147 |
| | ) | |
| BODEY COOK, | ) | Honorable |
| | ) | Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Bodey Cook was found guilty by a jury of first degree murder and aggravated

battery with a firearm. He was sentenced to consecutive prison terms of 30 years and 15 years,

respectively.

¶ 2    On appeal, he contends (1) the trial court abused its discretion by admitting hearsay and

allowing the State to misrepresent the evidence during closing argument, and this constituted

plain error because the evidence was closely balanced or, in the alternative, trial counsel was

ineffective for failing to preserve these errors; (2) the trial court abused its discretion during

*voir dire* by questioning a biased juror until she said she would be fair and preventing the defense from probing the juror's bias, and trial counsel rendered ineffective assistance by failing to use an available peremptory challenge to dismiss this juror; and (3) the trial court erred when it failed to appoint new counsel and hold a hearing on defendant's *pro se* claims of ineffective trial counsel.

¶ 3    For the reasons that follow, we affirm the judgment of the circuit court.

¶ 4                                    I. BACKGROUND

¶ 5    This case arose from a drive-by shooting that occurred on the evening of Thursday, August 19, 2010. Gunshots fired from a car struck and killed Roger Kizer and struck Estavion Thompson, who survived the attack. Eyewitnesses identified defendant Bodey Cook as the driver and codefendant Marcellus French as the shooter. French was arrested January 20, 2011, and defendant was arrested February 16, 2011. In 2013, defendant and French were tried jointly before a single jury.

¶ 6    At the trial, the State's evidence showed that, at about 11 p.m. on the date of the offense, the victims Kizer and Thompson were outside near 7450 South Kenwood Avenue in Chicago. Kizer's family lived on that block. Kizer and Thompson were either sitting on the back of a friend's parked car or standing by the car in the street. Several other people were also outside, including Andre Stackhouse, Shevely McWoodson, and Sherman Johnson. People were drinking alcohol. The street was residential and illuminated by streetlights.

¶ 7    Thompson had "only a cup" of alcohol and could not recall whether people were smoking or selling marijuana. Thompson saw defendant drive a small greenish turquoise Chevrolet Cavalier down the street past Thompson's group and stop at a stop sign. Defendant was alone in

the car. Thompson had known defendant from the area for about three years. About 15 minutes later, defendant, who was still alone, drove toward Thompson's group a second time. Kizer tried unsuccessfully to wave or "flag [defendant] down." Kizer told Thompson he wanted to talk to defendant about "what was going on between" defendant and Kizer's family. About 10 minutes later, defendant drove toward the group a third time but Thompson did not see him approach because Thompson's back was facing defendant's car. Thompson heard gunshots and saw Kizer fall. Thompson tried to run but fell. He was shot in his legs, chest, and stomach. He could not get back up so he crawled to the grass by the sidewalk side of a parked car. As he lay on the grass, he saw that defendant drove the car and the shooter in the passenger seat was a light-skinned male wearing a red hat. The police, however, did not recall Thompson giving that description of the shooter. Thompson also testified that the shooter yelled "bi*** something" as the car drove away. Kizer died at the scene from a gunshot wound to his chest, and Thompson was taken to the hospital.

¶ 8    Thompson spoke with detectives at the hospital the next day and identified defendant as the driver from a photo array. At that time, Thompson did not know defendant's full name. Two days later, on August 22, Thompson viewed a black and white photo array that included French's photo, but Thompson did not identify anyone as the shooter from that array. At that time, Thompson knew French's name but not his full name. At the trial, Thompson said French at the time of the shooting "looked totally different" from his black and white picture in the photo array. Thompson could not remember whether he told the police on August 22 that French was the shooter. On January 20, 2011, Thompson went to the police station and identified French, whom Thompson knew "from around the same area," out of a four-person lineup as the shooter.

Witnesses Stackhouse, McWoodson, and Johnson were also at the police station, but they were not present when Thompson viewed the lineup. In February 2011, Thompson identified defendant from a lineup as the driver. Thompson also identified defendant and French in court as the offenders.

¶ 9    Thompson testified that no one made him any promises in exchange for his testimony. At the time of the trial, he had a pending misdemeanor marijuana charge and prior felony convictions in 2005 for resisting a police officer and aggravated battery of a police officer and in 2004 for aggravated unlawful use of a weapon. When Thompson testified before the grand jury on February 16, 2011, he said he was under the influence when he had spoken with an assistant State's Attorney (ASA) in January 2011; however, at the trial Thompson denied being under the influence at the time of that conversation.

¶ 10    Andre Stackhouse was on parole at the time of the trial, failed to appear on the date specified by a subpoena, and was arrested and testified the next day. He had known both defendant and French since they were in preschool. Stackhouse had been drinking tequila on the night of the shooting. He was standing a couple of houses away from the Kizer home and talking with two girls when he saw defendant drive by in a greenish blue car alone. Not long thereafter, Stackhouse saw defendant drive east on 74th Street and then south on Kenwood Avenue. French was in the passenger seat, and half of his body was hanging out the window. He had a gun in his hand. Stackhouse did not see anyone in the car wearing a hat. Stackhouse moved into a gangway and heard several gunshots but did not look toward the shooting. After the shooting, he went to Kizer and Thompson and saw that they were shot. Sherman Johnson had a gunshot hole in his hat. Stackhouse left the scene and did not talk to the police that night.

¶ 11    On August 24, 2010, Stackhouse was arrested for a gun offense. He spoke with detectives on August 26 about the August 19 shooting. From photographs, Stackhouse identified defendant as the driver and French as the shooter. Stackhouse also identified defendant and French as the offenders in the lineups conducted in January and February of 2011 and again at the trial. Stackhouse did not receive any promises concerning his gun offense or his probation violation in exchange for his testimony. He faced a possible prison sentence of three to seven years for the gun offense and received the minimum sentence of three years. He had convictions in 2011 for aggravated unlawful use of a weapon and in 2009 for possession of a stolen motor vehicle. When a defense investigator came to the Stackhouse home in June of 2012, Stackhouse's mother told the investigator to leave, and Stackhouse did not discuss the shooting with him.

¶ 12    Shevely McWoodson was Kizer's uncle. At the trial, McWoodson testified he had known defendant and French a few months prior to the shooting by seeing them on the street a few times. However, McWoodson previously told the grand jury that he had known French for about three years. At the time of the offense, McWoodson was with Kizer and a group of other people on south Kenwood Avenue talking. McWoodson saw defendant drive by once in a small car alone. Then McWoodson walked to his house a couple of houses away from the group to use the restroom. When he was near the gate of his house, he saw defendant drive by again with French in the passenger seat. McWoodson saw French lean out the window, fire a gun, and shoot Kizer. McWoodson heard three gunshots and saw the gun emit flames when it was fired. He did not speak with police that night.

¶ 13    In January 2011, McWoodson went to the police station and identified defendant from a photo array as the driver and French from a lineup as the shooter. At trial, McWoodson testified

that he "pointed [French] out" before he asked the police to have everyone in the lineup smile. McWoodson knew French had a chipped tooth, which was visible when he smiled. However, according to McWoodson's grand jury testimony, he "knew" it was French but was not "sure," so he asked the detective to make the lineup participants smile and then saw French's chipped tooth and said, "That is him." At a second lineup in February 2011, McWoodson identified defendant as the driver, but McWoodson did not recall returning to the police station to view that second lineup. Also, McWoodson either did not understand what a grand jury was or did not remember testifying before the grand jury in February 2011.

¶ 14 Sherman Johnson was Thompson's cousin. Johnson had known defendant and French for Johnson's whole life. At the trial, Johnson testified that on the afternoon of August 19, 2010, everyone was standing in front of a school when Kizer unsuccessfully attempted to flag down defendant, who was driving a red Cadillac. Later that evening, Johnson was standing with the group on the 7400 block of south Kenwood Avenue. About 30 people were outside, and they were drinking alcohol and doing drugs. He heard gunshots and ran from the scene without looking to see the source of the gunfire. He never saw who fired the gunshots, was not grazed on his elbow by a bullet, and did not have a bullet knock any hat off his head.

¶ 15 Johnson fled Chicago a week after the shooting because he was wanted for an attempted murder that occurred in an unrelated case on August 25, 2010. He was apprehended and extradited back to Chicago on January 19, 2011. Thereafter, the detectives investigating the instant case brought him from the jail to the police station. Johnson claimed the detectives put him in a room with Thompson and urged him to "go with" Stackhouse's written statement. Johnson also claimed the police offered to help him with his pending case in exchange for his

cooperation in this matter. Johnson denied or could not recall giving the police and ASA any statement. Johnson initially maintained he did not recall testifying before the grand jury in February 2011, later admitted on cross-examination that he did in fact testify before the grand jury, and then on redirect claimed again that he did not recall testifying before the grand jury. He denied identifying defendant and French as the offenders and merely pointed them out in the photo arrays as people he knew. Johnson denied identifying defendant and French as the offenders in lineups conducted in January and February of 2011. Ultimately, Johnson pled guilty in his pending case in 2012 to a lesser charge of aggravated battery with a firearm, faced a possible sentence of 6 to 30 years in prison, and received a 7-year prison term without the detectives' help.

¶ 16    The State impeached Johnson's trial testimony with the testimony of detectives and the ASA; Johnson's January 21, 2011, signed written statement; his February 18, 2011, grand jury testimony; and a January 2011 photograph of his elbow. According to his signed statement, Johnson saw defendant drive by in a light green Chevy Cavalier. Defendant was alone, and Kizer called out defendant's name to get his attention. Kizer's cousins had a "beef" or argument with defendant. Defendant did not stop and sped off. When defendant drove by again about 15 to 30 minutes later, French was hanging out the passenger's-side window. The upper part of French's body was hanging out the window, and a gun was in his hand. French fired the gun several times. The detectives testified that Johnson identified defendant as the driver and French as the shooter in photo arrays in January 2011, identified French in a January 2011 lineup, identified defendant in a February 2011 lineup, and was never told he would receive help in any pending case in exchange for talking about this case.

¶ 17    When ASA Morgan Creppel interviewed Johnson before presenting his testimony to the grand jury in February 2011, Johnson confirmed that the police and detectives never made any promises to him in exchange for his cooperation. According to Johnson's grand jury testimony, he was standing with Kizer and Thompson on south Kenwood Avenue at the time of the offense. Kizer's cousin, who was selling marijuana, got into a truck with a buyer. As the truck drove away, the group noticed defendant, who was alone, follow the truck in a light turquoise Cavalier. When Kizer's cousin returned in the truck, defendant, who was still alone, was still following the truck. Kizer tried to flag defendant down, but defendant sped off. No one in the group noticed defendant's car as it approached them the third time. Johnson heard the first gunshot and looked in the direction from which the sound came. Johnson was shocked, "actually just got stuck," and "couldn't even move." He saw French hanging out of the passenger's side window of the car from his waist up, using the top of the car to try to balance himself, and pointing the gun at anybody and shooting. Defendant was driving the car. Johnson saw Kizer get struck first and Thompson get struck next. Then bullets grazed Johnson's elbow and knocked his hat off his head.

¶ 18    Codefendant French called two alibi witnesses, Romania Booker and her father Randy Alexander, who testified that French was with them at the time of the shooting. They were at the home of Booker's grandmother. Booker was pregnant with French's child, and her due date was August 19, 2010, so French stayed with her in case her water broke. Alexander testified that he and French stayed inside the house on August 19 but acknowledged they "were not joined at the hip." Alexander was convicted in 2011 of burglary and in 2007 of possession of a controlled substance. Booker testified that French remained by her side from noon on August 19 until the

child was born on August 24. Booker stopped dating French before he was arrested in January 2011 in this case. Although Booker knew about the arrest, she never contacted the police to inform them of this alibi. French's family helped Booker with expenses for the baby.

¶ 19    Defendant presented five family members to testify to his alibi that he was at his aunt's house at the time of the shooting. His family held a large surprise party for the aunt's 61st birthday, which lasted from about 6 p.m. on Thursday, August 19 until about 3:30 a.m. on Friday. The party was unplanned, and no invitations or emails were sent. They celebrated on Thursday because, contrary to her recorded birth date, that Thursday was the aunt's actual birth date. Also, defendant's sister, whom the family rarely saw, was in town visiting but returning to Birmingham on Friday.

¶ 20    Defendant's five alibi witnesses were his two sisters, Hagar and Sirena Crosby; his father, Jewell Crosby; his aunt, Sarma Jean Harris-Stewart; and his uncle, Peter Crosby. They testified that defendant had been staying with Sirena and her children in Carpentersville about a week before the party. Hagar picked them up in the morning on August 19 and drove to the aunt's house by about noon to get the house ready for the party. While Hagar and Sirena shopped for food and party supplies, defendant stayed at the house with his aunt and father. Defendant was still at the house when Hagar and Sirena returned a few hours later. The witnesses testified that they saw defendant during the course of the entire party, eating, drinking, and playing music and card games. At 11 p.m., everybody was singing happy birthday to the aunt. When Hagar left at about 1:45 a.m., defendant was drunk and asleep on the couch. Defendant slept at his aunt's house that night and woke up at 7 or 8 a.m., and his aunt made him pancakes. Defendant did not have a car and no one knew how he returned home. When certain witnesses learned that

defendant was arrested in February 2011 for murder, they did not alert the police that defendant had an alibi.

¶ 21    Defense Investigator John Byrne testified that he had been a Chicago police detective and sergeant in the detective division for 25 years. When he went to Stackhouse's home in June 2012, he informed Stackhouse that he worked for the defense. Stackhouse agreed to speak with him about this case and invited him into the house. Byrne was at the house for about 30 minutes but did not make any video or audio recording. Byrne took notes during the interview, which he used to write his two-page, undated report and then destroyed the notes. According to Byrne, Stackhouse said he did not see the face of either the shooter or driver when the car drove past him because it was dark outside and the incident happened quickly. Stackhouse merely saw the passenger extend an arm out the open window and fire a gun. Furthermore, in January 2011, detectives signed Stackhouse out of jail, brought him to the police station, and informed him that witnesses had already identified defendant as the driver and French as the shooter. The detectives said they would help Stackhouse with his pending case if he corroborated the testimony of those witnesses. Although Stackhouse told the detectives what they wanted to hear, they ultimately did not help him. Stackhouse mentioned his probation and asked Byrne if he could get in trouble for what he said during their interview. Stackhouse did not sign or review Byrne's report.

¶ 22    The jury found defendant guilty of the first degree murder of Kizer and guilty of the aggravated battery with a firearm of Thompson. The trial court sentenced defendant to consecutive prison terms of 30 years for murder and 15 years for aggravated battery with a firearm. The jury also found French guilty of first degree murder and aggravated battery with a firearm.

¶ 23                                      II. ANALYSIS

¶ 24     On appeal, defendant argues that (1) the trial court abused its discretion by admitting hearsay—*i.e.*, that Kizer wanted to stop defendant's car and talk to him about something going on between Kizer's family and defendant—and allowing the State to misrepresent the evidence during closing argument; (2) the trial court abused its discretion during *voir dire* by badgering a biased juror into saying she would be fair and preventing defense counsel from making further inquiry into that juror's bias, and trial counsel rendered ineffective assistance by failing to use an available peremptory challenge to dismiss that juror; and (3) the trial court erred when it failed to appoint new counsel and hold a hearing on defendant's claims of ineffective trial counsel.

¶ 25              A. Hearsay, Prior Inconsistent Statement, and Rebuttal Closing Argument

¶ 26     Defendant contends that the trial court abused its discretion when it admitted double hearsay during Thompson's testimony that Kizer told him Kizer wanted to stop defendant's car and talk to him about "something" that was "going on" between him and members of Kizer's family. Defendant also contends the trial court erred when it admitted as substantive evidence a statement from Johnson's signed written statement to the police and ASA—*i.e.*, that Kizer's cousins were having a "beef" with defendant—because the statement was not inconsistent with Johnson's trial testimony and did not narrate any event about which Johnson had personal knowledge. Defendant also argues that this hearsay motive evidence was irrelevant and the State failed to link it to defendant or lay any foundation for its admission. Finally, defendant argues that the State committed prosecutorial misconduct by (1) misstating the evidence to argue that defendant had a motive to kill Kizer because defendant had a "beef" with Kizer and (2) arguing without any supporting evidence in the record that Johnson disavowed at the trial his prior

statements identifying defendant and French as the offenders because Johnson was afraid of them.

¶ 27    Defendant acknowledges that he has forfeited review of these issues by failing to both timely object and include these issues in his motion for a new trial. However, he asks us to review this issue under the plain error doctrine, arguing that the evidence was so closely balanced that the errors severely threatened to tip the scales of justice against him.

¶ 28    In general, a defendant preserves an issue for review by timely objecting to it and including it in a posttrial motion. *People v. Denson*, 2014 IL 116231, ¶ 11. However, we may review claims of error under the plain error rule (Ill. S. Ct. R. 615(a)), which is a narrow and limited exception to forfeiture (*People v. Hillier*, 237 Ill. 2d 539, 545 (2010)). To obtain relief under this rule, defendant must show that a clear or obvious error occurred. *Id.* Defendant bears the burden of persuading the court that either (1) the evidence at the hearing was so closely balanced (regardless of the seriousness of the error) as to severely threaten to tip the scales of justice against the defendant or (2) the error was so serious (regardless of the closeness of the evidence) as to deny the defendant a fair trial and challenge the integrity of the judicial process. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). In order to determine whether the plain error doctrine should be applied, we must first determine whether any error occurred. *Id.*

¶ 29    A trial court's evidentiary rulings on hearsay testimony are reviewed for an abuse of discretion, which occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would take the view adopted by the trial court. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). Defendant argues that the determination of whether a specific statement is hearsay is purely a legal question reviewed *de novo*. Although reviewing courts sometimes

review evidentiary rulings *de novo*, this "exception to the general rule of deference applies in cases where 'a trial court's exercise of discretion has been frustrated by an erroneous rule of law.' " *Id.* (quoting *People v. Williams*, 188 Ill. 2d 365, 369 (1999)). "The decision whether to admit evidence cannot be made in isolation. The trial court must consider a number of circumstances that bear on that issue, including questions of reliability and prejudice." *Id.* In this case, the trial court exercised discretion in making these evidentiary rulings because the court based its rulings on the specific circumstances of this case and not on a broadly applicable rule. See *id.* at 89-90. Accordingly, we review these evidentiary rulings with deference to the trial court.

¶ 30    Hearsay evidence is testimony regarding an out-of-court statement offered to prove the truth of the matters asserted. *People v. Sullivan*, 366 Ill. App. 3d 770, 779 (2006).

> "The term *matters asserted* as employed in the definition of hearsay
> includes both matters directly expressed and matters the declarant necessarily
> implicitly intended to express. When the declarant necessarily intended to express
> the inference for which the statement is offered, the statement is tantamount to a
> direct assertion and therefore is hearsay. The declarant necessarily intends to
> assert (*i.e.*, implicitly asserts) matters forming the foundation for matters directly
> expressed in the sense that such additional matters must be assumed to be true to
> give meaning to the matters directly expressed in the context in which the
> statement was made. [Citation.] To illustrate, the question 'Do you think it will
> stop raining in one hour?' contains the implicit assertion that it is currently

raining." (Emphasis in original.) Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 801.1, at 635-36 (6th ed. 1994).

¶ 31 The presence or absence in court of the declarant of the out-of-court statement is irrelevant to a determination as to whether the out-of-court statement is hearsay. *People v. Lawler*, 142 Ill. 2d 548, 557 (1991). Unless hearsay falls within an exception to the hearsay rule, it is generally inadmissible due to its lack of reliability and the inability of the opposing party to confront the declarant. *Caffey*, 205 Ill. 2d at 88.

¶ 32                                    1. Thompson's Testimony

¶ 33 According to the record, Thompson testified that when defendant drove toward the group the second time, Kizer tried unsuccessfully to flag him down. When the prosecutor asked Thompson if Kizer told him why Kizer tried to stop defendant, defendant's counsel raised a hearsay objection. The prosecutor argued that the testimony was being elicited to prove motive and was not hearsay. Defendant's counsel responded that motive was not a hearsay exception, the statement was not made in the defendant's presence, it might be speculation, there was no foundation, and admission would violate defendant's right to confront witnesses. Codefendant French's counsel joined the objection. The trial court overruled the objections, found the testimony was not hearsay because it was not offered for the truth of the matter asserted, and allowed the testimony to explain the course of conduct. The trial court added that very often the statements of victims made just prior to their murder were admissible. Thompson then testified that Kizer said he wanted to stop defendant to talk "to him about what was going on between, something that his family and whatever, whoever has going on."

¶ 34    We find that the trial court erred in admitting Thompson's hearsay testimony that Kizer said he wanted to stop defendant to talk to him about something that was going on between defendant and Kizer's family. Contrary to the trial court's ruling, the statement was not admissible for the non-hearsay purpose of explaining the course of conduct because Kizer's out-of-court statement cannot be used to explain Kizer's own conduct. See *People v. Carroll*, 322 Ill. App. 3d 221, 223 (2001) (statements offered for their effect on the listener or to explain the subsequent course of conduct *of another* are not hearsay).

¶ 35    Furthermore, we cannot agree with the trial court's ruling that the statement was not hearsay because it was offered for some reason other than to prove the truth of the matter asserted. Kizer's statement that he wanted to stop the car to talk to defendant about something contains the implicit assertion that Kizer believed he observed defendant in that car. This is not a situation where the out-of-court statement was relevant simply because of the fact it was said. *E.g.*, *People v. Poe*, 121 Ill. App. 3d 457 (1984) (testimony that the witness spoke to the defendant over the telephone at a given time was offered as an alibi and thus was not hearsay); *People v. Shoultz*, 289 Ill. App. 3d 392, 395-96 (1997) (a statement offered to prove the listener had notice of the information contained therein was not hearsay). Here, the relevance of the implicit assertion in Kizer's out-of-court statement depends on Kizer believing that it was true, so it was offered for the truth of its content that defendant was in the car and therefore is hearsay. Similarly, Kizer's directly expressed assertion that he wanted to talk to defendant about something that was going on between defendant and Kizer's family is also relevant only for the truth of its content.

¶ 36 We conclude that the admission of Thompson's hearsay testimony was error and will address below whether this error constitutes plain error.

¶ 37                              2. Johnson's Prior Inconsistent Statement

¶ 38 According to the record, information similar to Thompson's hearsay testimony came before the jury again, without any objection from defense counsel, when the State confronted Johnson with portions of his signed written statement to the police and ASA, *i.e.*, that Kizer tried to get defendant's attention by calling out his name and that Kizer's cousins were having a "beef" or argument with defendant. Although Johnson denied making the signed statement, the State perfected its impeachment of Johnson during the testimony of Detective Clifford Martin, wherein the relevant excerpts of Johnson's written statement were admitted into evidence.

¶ 39 Defendant argues that Johnson's prior statement that Kizer's cousins were having a "beef" with defendant was not admissible as substantive evidence because it was not inconsistent with Johnson's trial testimony and he did not have personal knowledge of the alleged "beef."

¶ 40 In a criminal case, a prior statement may be admissible as substantive evidence if it is inconsistent under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2010)). *People v. Harvey*, 366 Ill. App. 3d 910, 922 (2006). Section 115-10.1(c) of the Code provides, in relevant part, that a prior inconsistent statement may be offered not just for purposes of impeachment, but as substantive evidence, if the witness is subject to cross-examination concerning the statement; the statement narrates, describes, or explains an event or condition of which the witness had personal knowledge; and the statement is proved to have been written or signed by the witness. 725 ILCS 5/115-10.1(b), (c)(2)(A) (West 2010); see also Ill. R. Evid. 801(d)(1)(A)(2)(a) (eff. Oct. 15, 2015).

¶ 41     To satisfy the exception's "personal knowledge" requirement, " 'the witness whose prior inconsistent statement is being offered into evidence must actually have seen the events which are the subject of that statement.' [Citations.]" (Internal quotation marks omitted.) *People v. McCarter*, 385 Ill. App. 3d 919, 930 (2008) (quoting *People v. Cooper*, 188 Ill. App. 3d 971, 973 (1989)). Accordingly, " '[e]xcluded from this definition are statements made to the witness by a third party, where the witness has no firsthand knowledge of the event that is the subject of the statements made by the third party.' " *Id.* (quoting *People v. Morgason*, 311 Ill. App. 3d 1005, 1011 (2000)). The witness must have observed the events he is speaking of, rather than have heard about them afterwards. *Morgason*, 311 Ill. App. 3d at 1011. Section 115-10.1 seeks to advance the legislature's goal of "prevent[ing] a 'turncoat witness' from merely denying an earlier statement when that statement was made under circumstances indicating it was likely to be true." *People v. Thomas*, 354 Ill. App. 3d 868, 882 (2004).

¶ 42     If a prior inconsistent statement is not admissible as substantive evidence, that statement may only be used for impeachment when the testimony of that witness does "affirmative damage" to the party's case. *People v. Cruz*, 162 Ill. 2d 314, 361-62 (1994) (citing *People v. Bradford*, 106 Ill. 2d 492, 500 (1985)). "It is only when the witness'[s] testimony is more damaging than his complete failure to testify would have been that impeachment is useful." *People v. Sims*, 285 Ill. App. 3d 598, 610 (1996) (citing *People v. Weaver*, 92 Ill. 2d 545, 563-64 (1982)). See also *People v. Martinez*, 348 Ill. App. 3d 521, 532 (2004) (damaging testimony "is not limited to direct contradictions but also includes evasive answers, silence, or changes in position"). For a witness's testimony to be affirmatively damaging, as opposed to merely

disappointing, it must give "positive aid" to the other side. *People v. Johnson*, 2013 IL App (1st) 111317, ¶ 47.

¶ 43     The record refutes defendant's assertion that the challenged prior statement was not inconsistent with Johnson's trial testimony. The term "inconsistent" in section 115-10.1 is not limited to direct contradictions but also includes evasive answers, silence, or changes in position. *People v. Campbell*, 2015 IL App (1st) 131196, ¶ 27. Johnson testified at trial that on the afternoon of the date in question, everyone was standing in front of a school when defendant drove by in a red Cadillac and Kizer unsuccessfully attempted to stop defendant. Johnson also testified that the shooting occurred later that evening when about 30 people were outside on the residential block of 7400 South Kenwood Avenue, drinking and doing drugs. According to Johnson's trial testimony, he ran from the scene when he heard gunfire, did not look to see the source of the gunfire, never saw who fired the gunshots, and was not grazed by any bullet.

¶ 44     This testimony was inconsistent with Johnson's prior signed statement, which narrated that, at the time of the shooting, Johnson observed defendant drive by the group on South Kenwood Avenue. Defendant was alone and drove a light green Chevy Cavalier. Kizer called out defendant's name to get his attention. Kizer's cousins had a "beef" or argument with defendant, who did not stop and sped off. When defendant drove by again about 15 to 30 minutes later, Johnson observed codefendant French hang out the passenger's-side window and fire several gunshots.

¶ 45     Furthermore, when the prosecutor questioned Johnson about giving the prior signed statement, she asked, "Isn't it true that you also told [the detective and assistant State's Attorney] *** that [Kizer's] cousin was having a beef with [defendant] and that the beef means that they

were having an argument?" Johnson responded, "No. Who was he? Which one?" The record clearly establishes that Johnson's challenged prior statement was inconsistent with his trial testimony.

¶ 46    However, Johnson's prior inconsistent statement does not indicate whether his knowledge about the argument between defendant and Kizer's cousins was based on Johnson's observation of some event or whether he heard about it afterwards. The State argues that sufficient evidence showed that Johnson had personal knowledge about the "beef" between Kizer's cousins and defendant because Johnson's signed statement does not state that his knowledge came from Kizer or any statement Kizer, or anyone else, made to Johnson. According to the State, Johnson simply narrated from his own knowledge that there was a beef, and it is speculative to conclude that he learned about it by someone telling him about it rather than by Johnson being present when it occurred. As support, the State cites *People v. Simpson*, 2015 IL 116512, ¶ 34, where a witness gave a videotaped statement and said that the defendant admitted to the witness to beating the victim. The State used this videotaped statement as substantive evidence that the defendant struck the victim numerous times with a bat. The court concluded that the witness's videotaped statement was not admissible under section 115-10.1 because the witness had no personal knowledge of the beating allegedly delivered by the defendant; the witness had personal knowledge only of the defendant's admission and not the crime being described. *Id.* ¶¶ 32, 34.

¶ 47    *Simpson* does not support the State's argument. Whereas the circumstances in *Simpson* clearly indicated that the witness did not have personal knowledge of the beating, Johnson's signed statement gives no indication whether the source of his knowledge about the argument

was based on his own observation of the argument or what someone told him. Under the circumstances of this case, the absence of any indication about the source of Johnson's knowledge about the argument is not sufficient for the State to meet its burden under section 115-10 to show that Johnson had personal knowledge about it. Accordingly, this statement was not admissible as substantive evidence.

¶ 48    We find, however, that the prior inconsistent statement was admissible for impeachment purposes because Johnson's testimony did affirmative damage to the State's case where Johnson testified that the incident between Kizer and defendant happened earlier during the afternoon on the date of the shooting, at a different location outside a school, and no gunshots were fired. Johnson also affirmatively damaged the State's case when he disavowed his prior signed statement and grand jury testimony, which identified defendant and French as the offenders, claimed the prior signed statement was a forgery, and alleged that the police put him in a room with his cousin Thompson and urged Johnson to "go with" Stackhouse's signed written statement in exchange for a deal on Johnson's pending attempted murder case. See *People v. Morales*, 281 Ill. App. 3d 695, 701 (1996) (although the trial court improperly allowed a witness's handwritten statement as substantive evidence, that error was harmless because the statement was admissible to impeach the witness's credibility).

¶ 49    Even if Johnson's statement that Kizer's cousins had an argument with defendant was admitted erroneously as substantive evidence, the error was harmless because essentially the same evidence was properly and substantively introduced through Johnson's grand jury testimony, and there is no personal knowledge requirement for grand jury testimony under section 115-10.1(c)(1). *People v. Donegan*, 2012 IL App (1st) 102325, ¶¶ 37-38; *Harvey*, 366 Ill.

App. 3d at 921-22; *Morales*, 281 Ill. App. 3d at 701. Although defendant disagrees, we find that Johnson's grand jury testimony described an incident showing that there was some type of dispute between Kizer's cousin and defendant. Specifically, according to Johnson's grand jury testimony, he observed that when Kizer's cousin drove away in the truck to conduct a drug sale, defendant followed the truck. When the cousin returned in the truck, defendant was still following the cousin. At that point, Kizer, who also had observed defendant's harassing or threatening conduct toward Kizer's cousin, attempted to stop defendant's car.

¶ 50    Accordingly, we find no error in the admission of Johnson's prior inconsistent statement.

¶ 51                              3. Relevance and Foundation

¶ 52    Defendant argues that the trial court abused its discretion by admitting the State's motive evidence, *i.e.*, the two complained-of statements by Thompson and Johnson, because those statements were vague generalizations, were irrelevant, and lacked an adequate foundation. Defendant contends that the State failed to prove the facts constituting the alleged motive, defendant's knowledge of those facts, or that the motive was attributable to him at the time of the offense. Defendant contends that there was no evidence of who had a beef with defendant, which or how many of Kizer's cousins or family members were involved, when the beef arose, what the beef was about, or even that Kizer knew of or was part of the beef.

¶ 53    "Although the State has no obligation to prove motive, the State may introduce evidence which tends to show that an accused had a motive for killing the deceased." *People v. James*, 348 Ill. App. 3d 498, 509 (2004). "The test of relevance is whether the fact introduced in evidence has a tendency to make the proposition at issue more or less probable." *People v. Merritt*, 64 Ill. App. 3d 482, 488 (1978). "Generally, while any evidence which tends to show that an accused

had a motive for killing the deceased is relevant, such evidence, to be competent, must at least to a slight degree tend to establish the existence of the motive relied on." *People v. Stewart*, 105 Ill. 2d 22, 56 (1984).

¶ 54 We have already determined that Thompson's statement was inadmissible hearsay. Nevertheless, we proceed with our plain error analysis and find, contrary to defendant's argument on appeal, that the State established a proper foundation for Thompson's statement, which indicated that Kizer said it when Thompson observed Kizer try to stop defendant's car during the second drive-by. This occurred after 11 p.m. on August 19, 2010, while Kizer and Thompson were sitting or standing near a parked car on South Kenwood Avenue with other people Thompson named during his trial testimony. The record establishes that basic foundational requirements were met concerning Thompson's complained-of statement. Furthermore, Thompson's statement—that Kizer said he wanted to talk to defendant about something that was going on between Kizer's family and defendant—was too vague to suggest a motive and, thus, the additional foundation applicable to motive evidence was not implicated here.

¶ 55 The defense did not object to Johnson's prior inconsistent statement that Kizer's cousins and defendant were having an argument, and the application of the forfeiture rule "is particularly appropriate when a defendant argues that the State failed to lay the proper technical foundation for the admission of evidence" for the first time on appeal. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). Nevertheless, we proceed with our plain error analysis and acknowledge that the admission of an out-of-court statement to show inconsistency with trial testimony requires an adequate foundation. See, *e.g.*, *People v. Hallbeck*, 227 Ill. App. 3d 59, 63 (1992) (foundation

required whether a prior inconsistent statement is admitted for substance or for impeachment). A proper foundation includes directing the witness toward the time, place, and circumstances of the statement, including the person to whom it was made, as well as to the substance of the statement. *Id.* at 62; *People v. Cobb*, 97 Ill. 2d 465, 479-80 (1983). The witness then must have the opportunity to explain the inconsistency. *Hallbeck*, 227 Ill. App. 3d at 62.

¶ 56　　The record establishes that the basic foundational requirements were met when the prosecutor asked Johnson about his presence at the police station in January 2011; whether he spoke with the detectives and ASA; whether he signed each page of his January 21, 2011, written statement; whether his statement was voluntary; and whether he told the ASA and detective that he was present at the scene of the shooting, he observed Kizer attempt to stop defendant's car, and Kizer's cousins were having a "beef" with defendant. Although Johnson's signed statement did not specifically indicate the source of his knowledge about the "beef," this did not prejudice defendant where, as discussed above, essentially the same information was properly admitted as substantive evidence through Johnson's grand jury testimony, which indicated that the conflict involved defendant following Kizer's cousin, who was engaged in selling drugs, that Johnson and Kizer observed defendant's harassing conduct and Kizer tried unsuccessfully to stop defendant's car, and that defendant returned shortly thereafter with French, who fired gunshots at Kizer's group. See *Donegan*, 2012 IL App (1st) 102325, ¶ 38 (because the same testimony was properly introduced substantively through the witnesses' grand jury testimony, any alleged error by the trial court in permitting the introduction of their handwritten statements was harmless).

¶ 57　　The relevance of motive evidence must be fairly inferable from the evidence; direct testimony to this effect is not necessary. *People v. Wallace*, 114 Ill. App. 3d 242, 249 (1983).

Here, defendant's motive to attack Kizer and his group with the drive-by shooting was fairly inferable from the State's evidence of a conflict between Kizer's family member and defendant. See *People v. Orr*, 149 Ill. App. 3d 348, 364 (1986) (evidence of a conflict between the defendant and his ex-girlfriend was properly considered as motive evidence for the defendant setting fire to her family member's home). Furthermore, defendant's argument that the evidence failed to establish that he knew about the dispute lacks merit. The State's evidence showed that defendant drove his car past Kizer and his group when defendant followed Kizer's cousin, who was engaged in a drug sale. Moreover, when the cousin returned from the drug sale, defendant was still following him. Kizer, Thompson, and Johnson had observed defendant's harassing conduct. When Kizer called defendant's name and attempted to stop him, defendant, whose car window was open, sped off. Shortly thereafter, defendant returned to the scene with codefendant French, who fired multiple gunshots at Kizer and his group. The State's evidence showed that defendant was aware of the facts giving rise to the alleged motive for the crime.

¶ 58    For purposes of our plain error review, we find that no clear error on relevance or foundation grounds occurred regarding the admission of the State's motive evidence.

¶ 59                              4. The Prosecutor's Closing Argument

¶ 60    Next, defendant argues that the trial court improperly overruled defense objections during closing argument and thereby allowed the State to commit prosecutorial misconduct by interjecting matters unsupported by the evidence and misleading the jury regarding what the testimony actually established. Specifically, defendant contends that no evidence supported the prosecutor's argument that Johnson disavowed at trial his prior identifications of defendant and French as the offenders because Johnson was afraid of them. Defendant also contends that the

prosecutor erroneously stated, over the defense's objection, that defendant's motive to kill Kizer was defendant's argument with Kizer himself. Defendant argues that this court should review this issue *de novo* because "the record reveals that the State made the remarks in question, and only the application of the law to these undisputed facts remains at issue."

¶ 61    "The regulation of the substance and style of closing argument lies within the trial court's discretion; the court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion." *Caffey*, 205 Ill. 2d at 128. A prosecutor is allowed wide latitude during closing arguments. *People v. Nieves*, 193 Ill. 2d 513, 532-33 (2000). A prosecutor may comment on the evidence presented at trial, as well as any fair, reasonable inferences therefrom, even if such inferences reflect negatively on the defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Remarks made during closing arguments must be examined in the context of those made by both the defense and the prosecution, and must always be based upon the evidence presented or reasonable inferences drawn therefrom. *People v. Coleman*, 201 Ill. App. 3d 803, 807 (1990).

¶ 62    The court reviews *de novo* the legal issue of whether a prosecutor's misconduct, like improper statements at closing argument, was so egregious that it warrants a new trial. *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). The reviewing court asks whether the misconduct "engender[ed] substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *Id.* at 123. "Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction." *Id.*

¶ 63    This court has remarked multiple times that a conflict exists concerning whether a reviewing court should apply an abuse of discretion analysis or *de novo* review to allegations challenging a prosecutor's remarks during closing argument. See, *e.g.*, *People v. Deramus*, 2014 IL App (1st) 130995, ¶ 35; *People v. Hayes*, 409 Ill. App. 3d 612, 624 (2011); *People v. Raymond*, 404 Ill. App. 3d 1028, 1059-60 (2010). However, a careful review of supreme court precedent establishes that no such conflict exists. Specifically, supreme court decisions have applied the two standards of review separately to the appropriate issue addressed on appeal.

¶ 64    In *People v. Blue*, 189 Ill. 2d 99, 128-34 (2000), the court held that the trial court abused its discretion by permitting the jury to hear the prosecutor's arguments that the jury needed to tell the police it supported them and tell the victim's family that he did not die in vain and would receive justice. In *People v. Hudson*, 157 Ill. 2d 401, 441-46 (1993), the court found under the abuse of discretion standard that the prosecutor's closing argument remarks about the defendant's concocted insanity defense and his expert's lack of credibility did not exceed the scope of the latitude extended to a prosecutor. In contrast, in *Wheeler*, 226 Ill. 2d at 121-31, the supreme court reviewed *de novo* whether a new trial was warranted based on the prosecutor's repeated and intentional misconduct during closing argument, which involved vouching for police credibility, attacking defense counsel's tactics and integrity, disparaging former defense counsel, and persistently stating that the prosecution was representing the victims. Whereas a reviewing court applies an abuse of discretion analysis to determinations about the propriety of a prosecutor's remarks during argument (*Blue*, 189 Ill. 2d at 128; *Hudson*, 157 Ill. 2d at 441), a court reviews *de novo* the legal issue of whether a prosecutor's misconduct, like improper remarks during argument, was so egregious that it warrants a new trial (*Wheeler*, 226 Ill. 2d at

121). Our supreme court has not created any conflict about the appropriate standard of review to be applied to these two different issues.

¶ 65    According to the record, defense counsel argued that the State had paraded in front of the jury witnesses who were all felons, shooters, thieves, people who resisted the police, probation violators, and people currently on probation or parole or suffering from dementia. Counsel argued that the State's witnesses were not credible due to their inconsistent statements, motives, or bias. Counsel also argued that the testimony of the State's witnesses was not corroborated by any DNA evidence, fingerprints, bullet casings at the scene, recovered gun, turquoise car, surveillance camera recording, or motive. According to counsel, the jury could not even think about motive because a motive had not been shown. Furthermore, counsel asserted that Johnson came to court with no fear, told the jury the truth, and was not afraid.

¶ 66    In rebuttal, the prosecutor responded that defendant and French perpetrated their brazen crime in front of the State's witnesses, thinking the witnesses would not come to court due to their criminal backgrounds and fear from the offenders' bold surprise attack. Then the prosecutor argued, over the defense's objection, that although Johnson lied when he testified at the trial, his prior statements were truthful and admissible evidence "because the law knows *** [p]eople could have a change of heart and that's exactly what happened, and isn't Sherman Johnson justified in his possible fear of those two defendants?" Later, the prosecutor argued that the jury should not discount eyewitness testimony and "[t]here was a motive. [Defendant] had a beef with Roger Kizer." The trial court overruled defendant's objection, and the prosecutor continued:

"[Defendant] had a situation with Roger Kizer. And then [defendant] came back.

He's angry, anger what a motivating factor that is, and the motive, how are you

really going to explain the motive on such an irrational act like that besides anger to arm yourself with a gun and ride down the street with your partner driving, and he's got a loaded weapon that you're carrying as you're inching up there, and you're going to fire it at all of those people."

¶ 67 We find no abuse of discretion by the trial court in overruling the defense objections. Viewed in context, the record establishes that the State was responding to the defense arguments that Johnson was not afraid when he testified at the trial and that there was no evidence of a motive. *Hudson*, 157 Ill. 2d at 441. Although the prosecutor erroneously stated that the argument was between defendant and Kizer, rather than defendant and Kizer's cousins, that comment was brief and isolated in the context of the entire closing argument, and the trial court thoroughly and repeatedly admonished the jury that closing arguments were not evidence. Accordingly, under a *de novo* standard, we find that the prosecutor's misstatement was not so egregious that a new trial is warranted. *Cf. Wheeler*, 226 Ill. 2d at 123-25.

¶ 68                                     5. Plain Error

¶ 69 Contrary to defendant's arguments about multiple errors involving inadmissible evidence, we find that the only clear error for purposes of our plain error analysis was the admission of Thompson's hearsay testimony that Kizer said he wanted to stop defendant to talk "to him about what was going on between, something that his family and whatever, whoever has going on."

¶ 70 As discussed above, Thompson's hearsay contains the implicit assertion that Kizer believed he observed defendant in the car during the second drive-by. This implicit assertion that the deceased victim identified defendant does not pose a substantial risk of unfair prejudice to defendant because the State's four eyewitnesses also identified defendant as the driver of the car.

In addition, Thompson's actual description of what Kizer wanted to talk to defendant about was too vague to indicate a dispute existed between Kizer's family and defendant that motivated defendant to commit the drive-by shooting. However, assuming the inadmissible hearsay was prejudicial to defendant, we find that it does not rise to the level of plain error because the evidence in this case was not so closely balanced that the error alone severely threatened to tip the scales of justice against defendant.

¶ 71    A defendant invoking the first prong of the plain error rule must show that the quantum of evidence presented by the State against him rendered the evidence closely balanced. *People v. Sebby*, 2017 IL 119445, ¶ 69. "Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge." *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007). In order to determine whether the evidence was closely balanced, "a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 72    Thompson positively identified defendant as the driver when the police spoke to him at the hospital the next day after the shooting. Although two days after the shooting Thompson did not identify anyone in the photo array, which included French's picture, as the shooter, that photo array consisted of black and white photos printed on paper, and Thompson testified that French looked "totally different" in his photo array picture from his actual appearance. Our review of the record indicates that French's picture in the photo array is slightly blurred around his chin area and his hair was longer than when he participated in the lineup, from which Thompson positively identified French as the shooter. Moreover, Thompson was in the hospital

recovering from his injuries and surgery at the time he viewed the photo array. Although defendant asserts that Thompson told Detective Shirley Colvin two days after the shooting that "Tony" and "Ricky" were in the car, defendant is not correct. According to the record, Detective Colvin initially testified on cross-examination that she wrote in her notes of the investigation that someone said Tony and Ricky were in the car and she attributed those notes to her August 2010 conversation with Thompson. However, on redirect, the State demonstrated that Detective Colvin's notes of her conversation with Thompson were separate from the notes wherein someone mentioned Tony and Ricky, so Detective Colvin clarified that Thompson never mentioned Tony and Ricky as suspects.

¶ 73    Stackhouse had known both defendant and French since they were in preschool and identified them from photo arrays as the offenders only five days after the shooting. Stackhouse had the longest opportunity to observe the offenders approach during the final drive-by because he noticed defendant's car while it drove east on 74th Street and then turned south onto Kenwood Avenue. Furthermore, the upper half of French's body was hanging outside the passenger's-side window, French did not conceal his face, and Stackhouse stood on the sidewalk on the west side of Kenwood Avenue with an unobstructed view of the passenger's-side of defendant's car as it drove south on Kenwood Avenue. Although it was evening, the area was illuminated by streetlights, and Stackhouse even saw the gun in French's hand. Investigator Byrne's testimony failed to undermine Stackhouse's positive identifications of the shooter and the driver because Stackhouse denied speaking to Byrne about the shooting, Stackhouse never reviewed or signed Byrne's undated typed report of his alleged interview of Stackhouse, Byrne

did not make an audio or video recording of the alleged interview, and Byrne destroyed the notes he allegedly took during the interview.

¶ 74    Thompson's and Stackhouse's identifications of defendant and French as the offenders were corroborated by McWoodson's testimony and Johnson's prior inconsistent statements from his signed written statement and grand jury testimony. McWoodson was somewhat confused concerning some details, like whether he previously came to the criminal court building to appear before the grand jury and whether he identified French from a lineup as the shooter before McWoodson saw French's chipped tooth. Nevertheless, McWoodson knew defendant and French prior to the date of the shooting and identified them as the driver and shooter. Johnson's attempt to disavow his signed written statement and grand jury testimony, identifying defendant and French as the offenders, was unavailing. Johnson's statements identifying defendant as the driver and French as the shooter were essentially consistent with and even more detailed than the identification testimony of Thompson, Stackhouse, and McWoodson. Moreover, the testimony of the detectives and ASA established that Johnson's signed statement and grand jury testimony were accurate, voluntary, and not made in exchange for any promises of help in his pending case.

¶ 75    Although Stackhouse, McWoodson, and Johnson did not speak with police immediately after the shooting occurred, that is not surprising, considering that some of the witnesses were on probation and illegal drug use and sales and the consumption of alcohol were occurring on the street at the time of the shooting. Moreover, Stackhouse and Johnson spoke to the police only after they were arrested for separate offenses involving guns.

¶ 76    The defense opposed the State's identification evidence with weak alibi evidence. Defendant's alibi concerning the family party was weak, where family members asserted that the

party went from about 6 p.m. on Thursday, the date of the shooting, until about 3:30 a.m. the following Friday morning, and no photographs documenting defendant's presence at such an allegedly momentous family occasion were offered into evidence. French's alibi was similarly weak. Booker asserted that French remained by her side from noon on the date of the August 19, 2010, shooting until their child was born five days later, but even Booker's father conceded that French was not "joined at the hip" with anyone.

¶ 77    The evidence in the instant case was not closely balanced. Thompson's inability to identify French as the shooter shortly after the incident does not detract from the credibility of two of the State's other identification witnesses, Stackhouse and Johnson. Thompson knew French from around the neighborhood but did not know his full name, whereas Stackhouse and Johnson had known both French and defendant for many years, since they were children. On the day after the shooting, Thompson, while in the hospital, told the police that defendant, whom Thompson had known for about three years, was the driver and identified him from a photo array. Thompson's failure to tell the police at that time that French was the shooter was not surprising where Thompson did not notice the car approach the group the third time because his back was facing the car, he ran when he heard the gunshots, he fell to the ground, and he crawled to the grass before observing defendant's car and its occupants. In addition, Thompson explained that his inability to identify French from the photo array two days after the shooting was because French, whom Thompson did not know as well as Stackhouse and Johnson knew French, did not resemble French's picture in that photo array. Thompson recognized French as the shooter when he saw him in person in the January 2011 lineup that was conducted after French was arrested. Stackhouse and Johnson's identification testimony of French was stronger than Thompson's.

Five days after the shooting, Stackhouse told the police that defendant was the driver and French was the shooter and identified them from photo arrays. As discussed above, Johnson's attempt to disavow his identifications of defendant and French as the offenders was refuted by his prior inconsistent statements.

¶ 78    The relative credibility of the State's identification witnesses over the reliability of defendant's alibi witnesses was obvious and apparent. The testimony of the alibi witnesses was not sound; its veracity was taxed by the circumstances surrounding the alleged party. Although the alibi witnesses claimed that the party was a surprise for their aunt, defendant and others were supposedly at the aunt's house since noon, getting her house ready for the alleged surprise in her presence. Furthermore, even though the aunt's recorded birth date of August 20 fell on a Friday in 2010, the party was held on Thursday, August 19, 2010, the date of the shooting. Also, the party lasted until about 3:30 a.m., despite the fact that several family members had to attend work that day. Although the alibi witnesses claimed that the party was held on a Thursday to accommodate a visiting relative who was leaving town on Friday, the aunt did not know the last name of that relative, who did not testify. In addition, no emails, invitations, or photographs documented the occurrence of the alleged large birthday party. Moreover, defendant's family members never informed the police of this alibi after they learned that defendant was arrested in February 2011.

¶ 79    We find, based on the record, that defendant does not meet his burden to show that the error was prejudicial, *i.e.*, "that the quantum of evidence presented by the State against [him] rendered the evidence closely balanced." (Internal quotation marks omitted.) *Piatkowski*, 225 Ill. 2d at 566. The error in admitting Thompson's hearsay testimony—the essential substance of

which was properly admitted through Johnson's prior inconsistent statements—did not severely threaten to tip the scales of justice against defendant. Because defendant has failed to establish plain error, we hold him to the forfeiture of this claim.

¶ 80                          6. Ineffective Assistance of Counsel

¶ 81     In the alternative, defendant argues that trial counsel was ineffective by failing to object to Thompson's hearsay testimony, Johnson's prior inconsistent statements, and the lack of foundation for and irrelevance of this motive evidence. Defendant contends that if counsel had objected and kept out Thompson and Johnson's highly prejudicial statements in this close case, the outcome of the trial would have been different.

¶ 82     A defendant alleging a claim of ineffective assistance of counsel must satisfy both prongs of the test discussed in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires a showing that "counsel's performance was deficient" and the deficient performance "prejudiced the defense." To satisfy the first prong, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The second prong requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. If an ineffectiveness claim can be disposed of on the ground of insufficient prejudice, then that course should be taken, and the court does not need to consider the quality of the attorney's performance. *Id.* at 697.

¶ 83     In reviewing a claim of ineffective assistance of counsel, this court reviews counsel's actions under the totality of the circumstances of the individual case. *People v. Shatner*, 174 Ill.

2d 133, 147 (1996). Judicial scrutiny of counsel's performance is highly deferential, and counsel's trial strategy is given a strong presumption of reasonable professional assistance. *Strickland*, 466 U.S. at 689. To establish deficient performance, defendant must identify counsel's acts or omissions that allegedly are not the result of reasonable professional judgment and overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007); *Strickland*, 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Defendant must show that counsel's errors were so serious and his performance was so deficient that he did not function as the counsel guaranteed by the sixth amendment. *Perry*, 224 Ill. 2d at 342.

¶ 84 Because we have already determined that no clear error occurred concerning either the admission of Johnson's prior inconsistent statements (*i.e.*, the statements were admissible impeachment, and any erroneous admission as substantive evidence was harmless given Johnson's grand jury testimony) or the foundation for and relevance of the motive evidence, we review defendant's ineffective trial counsel claim based only on counsel's alleged failure to object to Thompson's hearsay testimony.

¶ 85 The record, however, establishes that trial counsel did object to the admission of Thompson's hearsay testimony but the trial court overruled that objection. Accordingly, defendant cannot satisfy the deficient performance prong of the *Strickland* test and his ineffective trial counsel claim fails.

¶ 86                    B. Juror Bias and Ineffective Assistance of Trial Counsel

¶ 87    Defendant argues that the trial court abused its discretion during *voir dire* when the court "pestered" a juror to agree that she could be fair despite her expressed opinions to the contrary. Defendant also argues that the trial court abused its discretion by denying defense counsel a fair opportunity to probe the juror's blatant biases and prejudices against not only the type of crime in this case generally but also against defendant and codefendant specifically. Defendant concedes that he failed to preserve these issues for review but asks this court to consider them as matters of plain error under either the first or second prong of the plain error rule because the evidence was closely balanced and the trial court's serious error affected the fairness of the trial and challenged the integrity of the judicial process. Defendant also argues that trial counsel was ineffective for failing to use a preemptory challenge to dismiss this juror.

¶ 88    According to the record, during *voir dire*, juror J.W. stated that her son was the victim of a crime. Specifically, during the previous year, her son was putting his children in his car, and someone walking down the street was shooting. The car was struck but no one was hurt. During that same week, two "kids" in the neighborhood were shot but no one was charged. When the trial judge asked J.W. whether anything about what had happened to her family members would make her unfair here on this unrelated case, J.W. responded, "It is hard to say it wouldn't because, because it may."

¶ 89    The judge then explained that a jury consists of 12 people with different backgrounds and life experiences and they are not told to disregard their life experiences because that would be impossible and would make our legal system less effective. While it was expected that J.W. would have negative feelings about the people who fired guns on her block and endangered her

family members, the question here was whether she would be able to keep those negative feelings properly directed toward the people involved in that other incident and not take it out here on the State or defendants. When the judge asked J.W. if she thought she would be able to do that, J.W. responded, "I can't say that I would, actually."

¶ 90    The judge then explained that she had only a couple of minutes to speak with each juror and thus did not have the luxury of knowing J.W., so J.W., who knew herself better than anybody, had to answer this question honestly. The judge continued:

> "I'm not saying it's going to be easy, but do you think you are the type of
>
> person that [would be] able to work and make sure that you kept those feelings
>
> separate and give both of these defendants a fair trial? Do you think you would be
>
> able to do that?"

J.W. responded, "Yeah. Yes."

¶ 91    During a sidebar, the judge referred to two other venire members who had started crying during questioning. The judge informed counsel that any further questioning of those two people would occur in chambers. After the sidebar, codefendant's counsel, Ms. Hatcher, questioned J.W. about her many years of work as a social worker, and the following occurred:

> "Q. And the experience with your son, you know, when you have to talk about
>
> something like that that happens again, it can bring up the feelings all over?
>
> MS. MURTAUGH [Assistant State's Attorney]: Judge, objection.
>
> THE COURT: Sustained. I'm going to sustain that line of questioning.
>
> MS. HATCHER [Codefendant's Attorney]: Sure.

Q. [Codefendant's Attorney:] I'd just ask you if maybe you think you can be fair in this case, but maybe this is not the right case for you, is that your feeling?

THE COURT: I'm going to sustain that, because this we talked about. The line of inquiry is not if anybody wants to do. I'm afraid the doors would open and I would lose the majority. But could you do it. I think she answered the question already.

Q. [Codefendant's Attorney:] Well, can I just follow up, because you, the first two times the judge asked you you weren't sure if you could do this job. Can you?"

MR. DEBONI [Assistant State's Attorney]: Objection.

THE COURT: I'm going to sustain that."

¶ 92    Thereafter, defendant's counsel, Mr. Murphy, questioned J.W.:

"Q. Miss [J.W.], I know you seemed like there was something about this case, where you couldn't be fair to the defendants. Is that what you were trying to say?

MS. MURTAUGH: Objection to that question.

THE COURT: Sustained.

Q. [Defendant's Attorney:] Is there anything in your mind that would prevent you being a fair juror?

A. My neighborhood is somewhat violent. You see a killing is going to happen at least once a month, once every two months. You get up at five o'clock, you see a young man laying dead on the street. So I'm looking at my neighborhood when I look at them.

Q. When you look at them, though, they say they're innocent in this case—

MS. MURTAUGH: Objection.

Q. [Defendant's Attorney:] Can you still presume them innocent because of your neighborhood?

THE COURT: I am going to sustain the [objection]. I think she's gone over it. As I said, the issue is not do you want to. Her answer would probably be no, if she is given a choice. But she indicated she would be a fair juror if pressed into service. So sustained as to that.

Q. [Defendant's Attorney:] Can you be fair to my client?

A. I will be fair."

¶ 93    Later, defendant's attorney moved to strike J.W. for cause, arguing that she vacillated, would agree with whoever asked her the last question, and lived near the area where the offense occurred. Codefendant's counsel joined the motion. The court denied the motion, stating that it was understandable that people like J.W., whose family members had been crime victims, would, if given a choice, "rather not do it. But when pressed [J.W.] truthfully answered she could do it." The trial court found that J.W. was sincere in her answer and even relented under questioning by defendant's counsel that she would be fair. Defense counsel did not use an available peremptory challenge against juror J.W.

¶ 94    In *People v. Rinehart*, 2012 IL 111719, our supreme court discussed the right to an impartial jury encompassed within the constitutional right to a jury trial.

"The trial court is primarily responsible for initiating and conducting *voir dire* ***. Because there is no precise test for determining which questions will filter out partial jurors [citation], the manner and scope of the examination rests within the discretion of the trial court, and we review such decisions for an abuse of

discretion. An abuse of discretion occurs when the conduct of the trial court thwarts the purpose of *voir dire* examination—namely, the selection of a jury free from bias or prejudice. [Citation.]; *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993) ('[t]he purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath'); see also *People v. Clark*, 278 Ill. App. 3d 996, 1003 (1996) ('The purpose of *voir dire* is to enable the trial court to select an impartial jury and to ensure that the attorneys have an informed and intelligent basis on which to exercise peremptory challenges.'). Stated differently, a trial court does not abuse its discretion during *voir dire* if the questions create 'a reasonable assurance that any prejudice or bias would be discovered.' *People v. Dow*, 240 Ill. App. 3d 392, 397 (1992)." *Id.* ¶ 16.

¶ 95 "While a prospective juror may be removed for cause when that person's 'views would prevent or substantially impair the performance of his duties as a juror' [citation], an equivocal response does not require that a juror be excused for cause." *People v. Buss*, 187 Ill. 2d 144, 187 (1999). "An equivocal response by a prospective juror does not necessitate striking the prospective juror for cause where the prospective juror later states that he will try to disregard his bias." *People v. Hobley*, 159 Ill. 2d 272, 297 (1994).

¶ 96 A review of J.W.'s entire *voir dire* examination shows that the trial court did not abuse its discretion by questioning her to ascertain whether her strong feelings about her experiences would interfere with her ability to be fair to the parties in this case. The trial court is charged

with the responsibility of assuring that venire members are sufficiently questioned to filter out the members who are unable or unwilling to be impartial and to provide the attorneys with an informed and intelligent basis on which to exercise peremptory challenges. The record does not support defendant's characterization of the trial court's questioning of J.W. as "badgering" or "pestering" her into saying she could be fair. Rather, the trial court properly questioned J.W. to elicit a knowledgeable and honest answer about her ability to serve as a fair and impartial juror. J.W. showed only minor equivocations in her first two answers and renounced those answers after the court explained that the relevant issue was whether J.W. thought she was the type of person who could keep her strong feelings from her experiences with crime separate from this case, even though that might not be easy, and give the defendants a fair trial. Once this relevant issue was explained to J.W., she unequivocally indicated she would keep a fair and open mind when evaluating the evidence at trial. The trial court's questioning of J.W. was not an abuse of discretion. Therefore, no clear error occurred here, so defendant is held to his forfeiture of this issue.

¶ 97    We also find that the trial court acted within its discretion in sustaining the State's objections to defense counsel's inquiries of J.W. The record establishes that the trial court sustained objections to defense counsel's questions that were already asked of and answered by J.W. concerning her feelings about her family members being victims of crime and her ability to keep her strong feelings about her experiences with crime separate from this case and serve as a fair and impartial juror. Accordingly, the trial court did not abuse its discretion, so no error occurred and defendant is held to his forfeiture of this issue.

¶ 98    Finally, defendant argues that he was denied effective assistance of trial counsel when his attorney failed to use an available peremptory challenge to dismiss J.W. from the jury.

¶ 99    As discussed above, defendant must satisfy the two-prong test (deficient performance and prejudice) set out in *Strickland* to prevail on his ineffective assistance of trial counsel claim. Counsel's actions during jury selection are generally considered matters of trial strategy and judicial scrutiny is highly deferential to counsel's strategic choices, which are virtually unchallengeable. *People v. Manning*, 241 Ill. 2d 319, 333 (2011). The decision whether to exercise an available preemptory challenge is a strategic one. *People v. Bowman*, 325 Ill. App. 3d 411, 428 (2001).

¶ 100    Defendant's argument that counsel's decision not to remove J.W. with a peremptory challenge was objectively unreasonable and cannot be attributed to a matter of jury selection strategy is not persuasive. J.W. was a retired social worker and several members of her family were also social workers. In addition, counsel was aware that the criminal records of the State's witnesses would be brought out at the trial. Moreover, both defendant's attorney and French's attorney evaluated the circumstances from their own perspectives at the time and both made the same strategic decision not to use a peremptory challenge against J.W.

¶ 101    Even if we were to assume a deficiency on the part of defense counsel, defendant has not shown the requisite prejudice. The prejudice prong of the *Strickland* test generally requires the defendant to show "a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Where a defendant challenges his conviction, the question is whether a reasonable probability exists that, absent the alleged errors, the fact-finder would have entertained a reasonable doubt of guilt. *Id.* at 695. The evidence against defendant was more than sufficient to establish his guilt and his alibi evidence was weak; as discussed above, the evidence was not closely balanced. The record does

not support the proposition that J.W. held any clear bias or prejudice against defendant, and his mere speculation or conjecture about such bias or prejudice fails to show that the verdict would probably have been different if J.W. had not served as a juror. We find that defendant was not deprived of his constitutional right to effective assistance of counsel.

¶ 102                              C. Denial of the *Krankel* Motion

¶ 103   Defendant argues that the trial court erred when it failed to appoint new counsel for him and conduct a hearing on his *pro se* posttrial claims of ineffective assistance of trial counsel. Specifically, defendant argues that counsel admitted they did not interview two witnesses, who were listed on defendant's answer to discovery. Defendant also argues that the trial court failed to conduct an adequate *Krankel* inquiry into his claim that trial counsel failed to properly communicate with him and failed to present crucial information to rebut the State's motive evidence.

¶ 104   The common law procedure developed from *People v. Krankel*, 102 Ill. 2d 181 (1984), is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel. *People v. Patrick*, 2011 IL 111666, ¶ 29. It is settled that new counsel is not automatically appointed when that type of claim is raised. *People v. Moore*, 207 Ill. 2d 68, 77 (2003). Instead, the trial court first examines the factual basis of the defendant's claim. *Id.* at 77-78. If the trial court determines the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. *Id.* at 78. A claim lacks merit if it does "not bring to the trial court's attention a colorable claim of ineffective assistance of counsel" (*People v. Johnson*, 159 Ill. 2d 97, 126 (1994)), or is "conclusory, misleading, or legally immaterial" (internal quotation marks omitted) (*People v. Burks*, 343 Ill.

App. 3d 765, 774 (2003)). However, if the allegations show possible neglect of the case, new counsel should be appointed to investigate the defendant's claims and present them at a hearing. *Moore*, 207 Ill. 2d at 78. The goal of a *Krankel* proceeding is to facilitate the trial court's full consideration of a defendant's *pro se* claims of ineffective assistance of trial counsel and thereby potentially limit issues on appeal. *Patrick*, 2011 IL 111666, ¶ 41; *People v. Jocko*, 239 Ill. 2d 87, 91 (2010).

¶ 105    "[S]ome interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Moore*, 207 Ill. 2d at 78. A trial court assesses the defendant's *pro se* claim based on (1) defense counsel's answers to questions and explanations of facts and circumstances surrounding the defendant's allegations, (2) a brief discussion between the trial court and the defendant, or (3) the trial court's knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face. *Id.* at 78-79.

¶ 106    The supreme court has held that if the trial court made no determination on the merits, then our standard of review is *de novo*, which means we perform the same analysis that a trial judge would perform. *Id.* at 75; *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). If the trial court has reached a determination on the merits of a defendant's ineffective assistance of counsel claim in a *Krankel* inquiry case, we will reverse only if the trial court's action was manifestly erroneous. *McCarter*, 385 Ill. App. 3d at 941. "Manifest error" is error that is plain, evident, and indisputable. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). Even if the reviewing

court finds that the trial court made an error, the trial court's ruling will not be reversed if the error was harmless. *Moore*, 207 Ill. 2d at 80.

¶ 107   Defendant raised 17 claims in his *Krankel* motion but only pursued 3 in this appeal. First, defendant alleges he met his burden to show possible neglect because counsel admitted during the *Krankel* inquiry that no records indicated they ever interviewed two possible alibi witnesses, Ruby Harris or Arielle. Defendant offers no indication about the substance of testimony from these potential additional witnesses. At the *Krankel* inquiry, one defense attorney said the five alibi witness who testified "were all prepared," had all been "talked to in [his] office," and most of them more than once. He did not call the additional witnesses because they would not have benefitted the alibi but he could not recall why they would not have been helpful. The other attorney said that she could not recall without her notes whether the witnesses were detrimental to the alibi or simply did not see defendant during the relevant time period. Later, this attorney stated at the hearing on defendant's motion to reconsider the denial of his *Krankel* motion that she did a thorough investigation of the file and her records did not reflect whether the two witnesses were not amenable to coming in or missed appointments, so counsel had no recollection whether she interviewed them.

¶ 108   We find that defendant failed to show possible neglect concerning this claim. The record establishes that the trial court conducted a thorough *Krankel* inquiry of this issue. Furthermore, the court's finding that counsel made a strategic decision not to call the additional alibi witnesses was not manifestly erroneous and was supported by the evidence. Five alibi witnesses was a large number, and the more alibi witnesses presented, the greater the potential they would step on each other's testimony and create the impression that the alibi (here, a large family party)

never occurred. See *People v. Mitchell*, 60 Ill. App. 3d 598, 606 (1978) (where numerous alibi witnesses were presented at trial, testimony from other alibi witnesses would merely be cumulative and likely would not have altered the result). In addition, the trial court observed both of defendant's attorneys during the lengthy trial and had been familiar with the work of one of those attorneys for years. The trial court stated that both attorneys did an excellent job representing defendant, there was an incredible amount of impeachment and extensive cross-examination, and they did not rush their questioning of the witnesses.

¶ 109   Second, defendant argues that the trial court failed to conduct an adequate inquiry into whether defense counsel failed to properly communicate with him. Defendant alleged that counsel visited him in jail only once before the trial and would merely inform him of continuances at status hearings. Counsel responded that he talked to defendant for "countless hours" about the evidence and this case. Although counsel was not sure how many times he visited defendant in jail, he knew that he brought a notebook and showed defendant everything possible. Also, the trial judge observed that counsel had talked to defendant in the back of the courtroom numerous times during the three year pendency of this case. Furthermore, defendant admitted that he and counsel had discussions about defendant's alibi and counsel had read the reports and knew the circumstances about defendant's arrest and identification as the offender. Defendant also acknowledged that counsel explained why certain pretrial motions were not appropriate, why witnesses would be discredited due to their backgrounds, and why using information about another murder case to show the occurrence witnesses' motive to implicate defendant would make defendant look bad.

¶ 110   Our review of the record establishes that defense counsel clearly understood the factual and legal issues in the case and there was sufficient communication between the defense team and defendant. Moreover, defendant failed to show that additional communications would have altered the outcome of his case. Accordingly, we find no error concerning the trial court's inquiry of this issue.

¶ 111   Third, defendant argues that the trial court failed to conduct an adequate inquiry of counsel's alleged failure to present evidence to explain the motives of the State's occurrence witnesses to implicate defendant in this offense. At the *Krankel* inquiry, defendant stated that codefendant French had been acquitted of murder in 2009 in a case involving the friends and relatives of the State's occurrence witnesses, so they had a vendetta against French. Defense counsel indicated that he decided the information about French's 2009 acquittal of murder would not have benefitted defendant's case. Later, at the hearing on the motion to reconsider, defendant stated that French and Rico Clark were charged in 2007 for the murder of Damion Kendrick, who was a close friend of all the State's occurrence witnesses. Although defendant was "brought in" about that case, he was never charged. After French and Clark were acquitted in 2009, Kendrick's family and friends showed defendant "an undeserved animosity."

¶ 112   We find no error in the trial court's inquiry about this claim. As defense counsel properly assessed, the information that the witnesses were hostile to defendant because codefendant French and another man were acquitted of murdering the witnesses' close friend actually would have given defendant a motive to commit the drive-by shooting in this case. Consequently, the record shows that the strategic decision not to present this evidence was sound.

¶ 113   Our review of the record establishes that the trial court properly conducted an appropriate and impartial *Krankel* preliminary inquiry. Defendant was allowed to argue his position consistent with the claims in his *pro se* motion, and the defense attorneys were given a chance to describe or explain their actions or decisions. Moreover, defendant had the opportunity to place additional facts about his *Krankel* claims before the trial court at the hearing on his motion to reconsider.

¶ 114   We conclude that the trial court did not err when it denied defendant's posttrial ineffective counsel motion without appointing new counsel and conducting a hearing because defendant's claims pertained only to matters of trial strategy and did not show possible neglect of the case.

¶ 115                                III. CONCLUSION

¶ 116   For the foregoing reasons, we affirm the judgment of the trial court.

¶ 117   Affirmed.